Argued April 28, 1955, affirmed January 11, 1956

# BAER *v.* CITY OF BEND ᴇᴛ ᴀʟ

### 292 P. 2d 134

*Craig C. Coyner,* Bend, argued the cause and filed briefs for appellant.

*Harry A. English,* Bend, argued the cause and filed a brief for respondents.

Before WARNER, Chief Justice, and TOOZE, ROSSMAN, LUSK, LATOURETTE and PERRY, Justices.

**LUSK, J.**

The city of Bend maintains and operates a water system for supplying water to its inhabitants. In February, 1952, the mayor and city commissioners adopted an ordinance or resolution providing for the introduction of inorganic fluoride chemicals into the water supply. The plaintiff, a citizen, elector, taxpayer, resident and water-user of the city of Bend, for himself and all others similarly situated, commenced this suit against the city and its officials to enjoin the proposed action. The defendants demurred to the second amended

complaint. The court sustained the demurrer and, the plaintiff refusing to plead further, a decree of dismissal was entered from which this appeal is taken.

The main contentions of the plaintiff are that the legislation is unconstitutional because, if carried into effect, it will deprive the plaintiff of liberty in violation of the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States, and will encroach upon the freedom of religion secured by the First Amendment against abridgment by the United States and similarly secured to all persons by the Fourteenth Amendment against abridgment by a state. *Schneider v. New Jersey,* 308 US 147, 160, 84 L ed 155, 60 S Ct 146. The plaintiff also invokes the equivalent guarantees of freedom of religion in the Bill of Rights (Art I, §§ 2, 3 and 4) of the Constitution of Oregon. See *City of Portland v. Thornton,* 174 Or 508, 512, 149 P2d 972, cer. den. 323 US 770, 89 L ed 616, 65 S Ct 123.

From the allegations of the complaint, aided by the express concessions of counsel for the plaintiff at the oral argument, it appears that fluorides are introduced into a community's drinking water, when needed, for the purpose of "reducing dental caries," that is, decay of the teeth, among children. It is used in the proportion of one part fluoride to one million parts of water, and among children up to the age of 12 or 14 years it effects a reduction of dental decay by some 60 to 65 per cent. Although there is no direct benefit to adults, it is not alleged, nor is it contended, that the consumption of water so treated is harmful to them or anyone else. The concessions of counsel for the plaintiff to which we have referred only harmonize with scientific findings reflected in the opinions of the courts which have been called upon to consider constitutional

challenges to similar legislation. According to the opinion in *Chapman v. City of Shreveport,* 225 La 859, 74 So2d 142 (appeal dismissed for want of a substantial federal question, 348 US 892, 99 L ed 164, 75 S Ct 216), "By November 6, 1951, more than 840 communities, with a total population of 15,578,300, were using water supplies which had been artificially fluoridated in concentrations from .07 to 1.5 parts per million." As stated by the Supreme Court of Ohio in *Kraus v. Cleveland,* 163 Ohio St 559, 564, 127 NE2d 609, "Science has discovered a method whereby dental caries may be diminished" (p 564) and again "It is clear from the record that the fluoridation of water for the prevention of dental caries has progressed far beyond the experimental period and has now become an established method." (p 566). See Public Health Service Bulletin No. 62 (1951); Fluoridation of Municipal Water Supply, Report No. 140 (1952), National Institute of Municipal Law Officers; Henry A. Dietz, Fluoridation and Domestic Water Supplies in California, IV The Hastings Law Journal, p 1; *Kraus v. City of Cleveland,* (Court of Common Pleas of Ohio) 116 NE2d 779, 790-794, per Artl, J.

■ The legislation in question was adopted by the city in the exercise of its police power granted by a provision of its charter which authorizes it "to make ordinances, by-laws, and regulations * * * not repugnant to the laws of the state of Oregon or of the United States, that shall be deemed necessary to secure the peace, health and general welfare of the city and its inhabitants." Charter of the city of Bend, ch VII, art B, § 1. These powers the municipality derives from the state, and "According to settled principles the police power of a State must be held to embrace, at least, such reasonable regulations established directly

by legislative enactment as will protect the public health and the public safety." *Jacobson v. Massachusetts,* 197 US 11, 25, 49 L ed 643, 25 S Ct 358. See, also, *State v. Muller,* 48 Or 252, 255, 85 P 855, 120 Am St Rep 805, aff. 208 US 412, 52 L ed 551, 28 S Ct 324; *Foeller v. Housing Authority of Portland,* 198 Or 205, 236, 237, 256 P2d 752; *Daniels v. City of Portland,* 124 Or 677, 265 P 790, 59 ALR 512. As the Supreme Court of Massachusetts said in sustaining legislation providing for the introduction of chlorine into a community's water supply, "The preservation of the health and physical safety of the people is a purpose of prime importance in the exercise of the police power." *Commonwealth v. Town of Hudson,* 315 Mass 335, 52 NE2d 566. All this is expressly conceded by plaintiff, who says in his reply brief, "We concede that the general dental health of the citizens is a proper field for the exercise of State authority."

■ This and other concessions of plaintiff regarding the beneficial effects of the addition of fluoride to the water supply of the city as a means of reducing the "serious and widespread disease" (*Froncek v. City of Milwaukee,* 269 Wis 276, 69 NW2d 242, 246) of dental caries among children is all the answer that need be given to the claim that the regulation has no real, rational and substantial relation to the public health and the general welfare. See *Jacobson v. Commonwealth,* supra, 197 US at p 31; *State v. Muller,* supra, 48 Or at p 255; *Stettler v. O'Hara,* 69 Or 519, 530, 139 P 743, aff. 243 US 629, 61 L ed 937, 37 S Ct 475; *Commonwealth v. Town of Hudson,* supra. Whether, as plaintiff suggests, there are "more rational methods for reducing dental caries," is a legislative, not a judicial question, as is sufficiently shown by the cases just cited. And, as for judicial authority upon the

precise question now before us, every court of last resort in the country which has had occasion to consider the subject has sustained similar legislation as a valid exercise of the police power. *Dowell v. City of Tulsa,* (Okla) 273 P2d 859, cer. den. 348 US 912, 99 L ed 207, 75 S Ct 292; *DeAryan v. Butler,* 119 CalApp2d 674, 260 P2d 98, hearing denied by Supreme Court of California, cer. den. 347 US 1012, 98 L ed 1135, 74 S Ct 863; *Chapman v. City of Shreveport,* supra; *Kaul v. City of Chehalis,* 45 Wash2d 616, 277 P2d 352; *Kraus v. City of Cleveland,* supra, 163 Oh St at p 559; *Froncek v. City of Milwaukee,* supra.

■ The liberties of the citizen which the plaintiff asserts are threatened with invasion are religious liberty (apparently, although it is not explicitly stated, because fluoridation of the water supply involves enforced medication against the conscientious religious convictions of those adhering to certain religious sects); and the personal liberties of parents to guard the health of their children, and of individuals to determine for themselves whether they shall submit to medication thus furnished by the city. It is also alleged that the legislation is discriminatory because it will benefit only children and not adults. The complete answer, though not the only one, to the last contention is that the children of today are the adult citizens of tomorrow, and a measure reasonably calculated to prevent the spread of disease among children and improve their health cannot be said to be without benefit to the entire community. *Chapman v. City of Shreveport,* supra, 225 La at p 870; *Dowell v. City of Tulsa,* supra, 273 P2d at p 863; and see *State v. Muller,* supra, 48 Or at p 258.

■ Upon the general subject of the liberties protected by the Constitution it should be first observed

that they are not held absolutely but only subject to reasonable restraints imposed for the general welfare. As Mr. Justice Harlan said in speaking for the court in *Jacobson v. Massachusetts,* supra:

"\* \* \* But the liberty secured by the Constitution of the United States to every person within its jurisdiction does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint. There are manifold restraints to which every person is necessarily subject for the common good. On any other basis organized society could not exist with safety to its members. Society based on the rule that each one is a law unto himself would soon be confronted with disorder and anarchy. Real liberty for all could not exist under the operation of a principle which recognizes the right of each individual person to use his own, whether in respect of his person or his property, regardless of the injury that may be done to others."

See, also, *Chicago, B. & Q. R. Co. v. McGuire,* 219 US 549, 565, 55 L ed 328, 31 S Ct 259; *West Coast Hotel Co. v. Parrish,* 300 US 379, 391, 81 L ed 703, 57 S Ct 578, 108 ALR 1330.

As stated by Chief Justice Hughes in *West Coast Hotel Company v. Parrish,* supra, where the court upheld the legislation of Washington providing for the establishment of minimum wages for women and minors as a health measure:

"\* \* \* Liberty in each of its phases has its history and connotation. But the liberty safeguarded is liberty in a social organization which requires the protection of law against the evils which menace the health, safety, morals and welfare of the people. Liberty under the Constitution is thus necessarily subject to the restraints of due process, and regulation which is reasonable in relation to its subject and is adopted in the interests

of the community is due process." 300 US at p 391.

See in this connection *State v. Bunting,* 71 Or 259, 139 P 731, aff. sub nom. *Bunting v. Oregon,* 243 US 426, 61 L ed 830, 37 S Ct 435, Ann Cas 1918A, 1043.

In the Jacobson case the court recognized that there is "a sphere within which the individual may assert the supremacy of his own will and rightfully dispute the authority of any human government, especially of any free government existing under a written constitution, to interfere with the exercise of that will." 197 US at p 29. Nevertheless, the court held that a compulsory vaccination law of Massachusetts was constitutional, and sustained a conviction of violation of the statute by one asserting its invalidity. That was a much more drastic statute than the measure we are here dealing with because it subjected to prosecution anyone who refused to submit his person to the injection of vaccine. Likewise, statutes or ordinances excluding children from public schools who had not been vaccinated have been, with but few exceptions, uniformly sustained. *Zucht v. King,* 260 US 174, 67 L ed 194, 43 S Ct 24; *Hartman v. May,* 166 Miss 477, 151 So 737, 93 ALR 1408, and annotation, 93 ALR 1413, 1414; *Sadlock v. Board of Education,* 137 NJL 85, 58 A2d 218.

■ It cannot be successfully contended that the exercise of the police power for the protection of the public health—and this *is* a question of the public health—is restricted to situations of overriding public necessity or emergency or infectious or contagious diseases, for, as the Supreme Court of Ohio said in *Kraus v. City of Cleveland,* supra, 163 Oh St at p 562, "laws relating to child labor, minimum wages for women and minors and maximum hours for women and minors have all been upheld on the basis of the police power in relation

to public health. Regulations relating to control of venereal disease, blood tests for marriage licenses, sterilization, pasteurization of milk, chlorination of water and vaccination have all been held valid based on police power exercised in regard to public health."

■■ It is true that the specific guarantee of freedom of religion in the First Amendment and incorporated into the Fourteenth holds a preferred place by comparison with the liberties protected by the Due Process Clause of the Fourteenth Amendment when the latter is applied "for its own sake." *West Virginia State Board of Education v. Barnette,* 319 US 624, 639, 87 L ed 1628, 63 S Ct 1178, 147 ALR 674. See, also, *Schneider v. New Jersey,* supra, 308 US at p 161; *Thomas v. Collins,* 323 US 516, 529, 89 L ed 430, 65 S Ct 315. But it is not true, as counsel for the plaintiff asserts, that when First Amendment liberties are involved the presumption is one of unconstitutionality. All that has ever been held is that in such a case there is no presumption either way. "Choice on that border, now as always delicate, is perhaps more so where the usual presumption supporting legislation is balanced by the preferred place given in our scheme to the great, the indispensable democratic freedom secured by the First Amendment." *Thomas v. Collins,* supra.

■ It has never been held, said Mr. Justice BELT, speaking for this court in *City of Portland v. Thornton,* supra, 174 Or at p 513, that "the practice of religion is beyond reasonable limitation." As stated by the Supreme Court of Appeals of Virginia in *Rice v. Commonwealth,* 188 Va 224, 234, 49 SE2d 342, 3 ALR2d 1392, "The individual cannot be permitted, on religious grounds, to be the judge of his duty to obey the regulatory laws enacted by the State in the interests of the public welfare. The mere fact that such a claim of im-

munity is asserted because of religious convictions is not sufficient to establish its constitutional validity.'' In that case the Virginia court sustained, as have other courts, a statute which required parents, guardians, and others having control of young children, to send them to school, notwithstanding religious convictions of the dissenters. See *West Virginia State Board of Education v. Barnette,* supra, 319 US at p 631; *Commonwealth v. Beiler,* 168 Pa Super 462, 79 A2d 134. So, it is held that it is no defense to a charge of violation of a statute denouncing polygamy as a crime that the accused conscientiously believed as a tenet of his church that it was the duty of male members of the church, circumstances permitting, to practice polygamy (*Reynolds v. United States,* 98 US 145, 161-167, 25 L ed 244); that a state university which requires its students to take and complete a course in military science and tactics may, without offending against the First Amendment, exclude members of a church who refused to take such course because to do so would violate a tenet of their faith with reference to making war (*Hamilton v. Regents of the University of Southern California,* 293 US 245, 79 L ed 343, 55 S Ct 197); that a provision of a state labor law making it a penal offense for a parent or guardian or other person having custody of minor children under a certain age to permit them to sell newspapers, magazines or periodicals in any street or public place, is immune to challenge by a member of Jehovah's Witnesses based upon her belief in the scriptural injunction to preach the gospel—the periodicals sold by the child in the particular case being ''The Watchtower'' and ''Consolation,'' magazines put out by Jehovah's Witnesses for the propagation of their faith (*Prince v. Massachusetts,* 321 US 158, 88 L ed 645, 64 S Ct 438; *City of Portland*

*v. Thornton,* supra) ; that a conviction of a parent for refusing, in violation of a statute, to furnish needed medical attendance to his minor child should be sustained notwithstanding the religious scruples of the parent on that score (*People v. Pierson,* 176 NY 201, 68 NE 243, 98 Am St Rep 666, 63 LRA 187) ; that where a parent refused her consent to a necessary blood transfusion for his infant child because of religious convictions against the use of blood for that purpose a court might, without transcending constitutional limitations, appoint a guardian for the child and authorize the guardian to consent to such transfusion (*People v. Labrenz,* 411 Ill 618, 104 NE2d 769, 30 ALR2d 1132, cer. den. 344 US 824, 97 L ed 642, 73 S Ct 24) ; and that the board of regents of a university might deny registration to an applicant therefor who refused to comply with a requirement of the board that all students have an X-ray examination of the chest for the purpose of discovering possible tubercular infection, the basis of such refusal being that to submit to such an examination would violate the tenets of the applicant's church (*State v. Armstrong,* 39 Wash2d 860, 239 P2d 545).

The plaintiff relies on *Meyer v. Nebraska,* 262 US 390, 399, 67 L ed 1042, 43 S Ct 625, 29 ALR 1446; *Pierce v. Society of Sisters of the Holy Names,* 268 US 510, 69 L ed 1070, 45 S Ct 571, 39 ALR 468; and *West Virginia State Board of Education v. Barnette,* supra.

*Meyer v. Nebraska* involved the constitutionality of a statute of Nebraska which forbade the teaching in any school, public, private or parochial, of any subject except in English, and also forbade the teaching of any other language as a language until the pupil had attained and successfully passed the eighth grade. Violation of this statute was made a penal offense.

In *Pierce v. Society of Sisters of the Holy Names*

the challenged statute, adopted by the people of Oregon under the initiative, required parents and others having control of children between the ages of 8 and 16 years to send them to the public schools. Violation of the statute was punishable by fine or imprisonment in jail or both.

In the Barnette case the question was whether a state board of education, acting pursuant to a statute of Indiana, could constitutionally compel a school child to participate in the salute to the flag. The objectors were members of the sect known as Jehovah's Witnesses. They claimed that the regulation conflicted with a tenet of their religion based on scripture which forbade them to make unto themselves or bow down to or serve any "graven image." They considered that the flag was an image within this command. For their refusal to salute the flag children of this faith were expelled from school and threatened with sentence to reformatories maintained for criminally inclined juveniles and their parents were prosecuted or threatened with prosecution for causing delinquency.

All these measures were condemned as invasions of the liberties of the citizen. The so-called "German language" law of Nebraska and the Oregon compulsory public school attendance law were found to have their roots in a political theory that was repugnant to American principles of liberty. In the Nebraska case the court, after a reference to the Spartan system of assembling all males at seven into barracks and entrusting their education to official guardians, denounced the statute as "arbitrary, and without reasonable relation to any end within the competency of the state." In the Oregon case the court said:

"* * * The fundamental theory of liberty upon which all governments in this Union repose

excludes any general power of the state to standardize its children by forcing them to accept instruction from public teachers only. The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." 268 US at p 535.

And so, as stated in *Prince v. Massachusetts,* supra, the court "sustained the parent's authority to provide religious with secular schooling, and the child's right to receive it, as against the state requirement of attendance at public schools." 321 US at p 166.

In the "flag salute" case the court said that "the flag salute is a form of utterance" (319 US at p 632) and that the court was "dealing with a compulsion of students to declare a belief" (319 US at p 631). The action of the local authorities, therefore, was declared to invade "the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control" (319 US at p 642).

The famous "clear and present danger" test announced by Mr. Justice Holmes in *Schenck v. United States,* 249 US 47, 63 L ed 470, 39 S Ct 247, as applicable to legislative restriction of free speech, has either been misunderstood (as we prefer to think) or it was modified by *Dennis v. United States,* 341 US 494, 95 L ed 1137, 71 S Ct 857 (the case of the communist conspiracy), where, after a lengthy discussion and careful analysis of the decisions touching the question, Chief Justice Vinson said:

"Chief Judge Learned Hand, writing for the majority below, interpreted the phrase as follows: 'In each case [courts] must ask whether the gravity of the "evil," discounted by its improbability, justi-

fies such invasion of free speech as is necessary to avoid the danger.' 183 F2d at 212. We adopt this statement of the rule. As articulated by Chief Judge Hand, it is as succinct and inclusive as any other we might devise at this time. It takes into consideration those factors which we deem relevant, and relates their significances. More we cannot expect from words.'' 341 US at p 510.

Incorporation of the First Amendment into the Fourteenth has not rendered the states and their political subdivisions impotent to enact reasonable laws for the protection of the public health. We think that the fluoridation measure of the city of Bend passes the test of reasonableness. It is not designed to pour the children of the community into a common mould, of the state's own fashioning, in order to achieve an illusory unity. It does not compel expression of belief in a creed repugnant to the religious convictions of the members of any church. It involves far less of interference with legitimate parental authority than the regulations sustained in *Prince v. Massachusetts* and *City of Portland v. Thornton.* The ''clear and present danger'' in those cases was the injury to the health and morals of young children which could be expected to result from permitting them to sell papers on the public streets; in this case it is a children's disease of serious proportions. It is to be borne in mind that ''Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices.'' *Reynolds v. United States,* supra, 98 US at p 166. Mr. Justice Cardozo, in his concurring opinion in *Hamilton v. Regents of the University of Southern California,* supra, in which Justices Brandeis and Stone joined, called attention to the fact that exemption from military service had been usually granted in this country to

conscientious objectors as an act of grace and was frequently coupled with a condition that they supply the Army with a substitute or with the money necessary to hire one. ''Never in our history,'' he wrote, ''has the notion been accepted, or even, it is believed, advanced, that acts thus indirectly related to service in the camp or field are so tied to the practice of religion as to be exempt, in law or in morals, from regulation by the state.'' 293 US at p 267.

Quite as indirect is the relationship between the measure before us and so-called enforced medication and the practice of religion. The argument respecting enforced medication has been in some cases coupled with a claim that fluoridation of a community's water supply amounts to the practice of medicine or dentistry by a municipality. Such a claim is found in the plaintiff's complaint, though at the argument it was expressly withdrawn by plaintiff's counsel. Upon this subject we agree with what the Oklahoma court said in *Dowell v. City of Tulsa,* supra:

''* * * in the contemplated water fluoridation, the City of Tulsa is no more practicing medicine or dentistry or manufacturing, preparing, compounding or selling a drug, than a mother would be who furnishes her children a well-balanced diet, including foods containing vitamin D and calcium to harden bones and prevent rickets, or lean meat and milk to prevent pellagra. No one would contend that this is practicing medicine or administering drugs.'' 273 P2d at p 864.

We see no difference from a constitutional standpoint between introducing chlorine into a water supply to remove impurities and thereby safeguard the public health, and introducing fluorides to reduce the incidence of dental decay among children and thereby promote the public health and general welfare. Yet today

chlorination seems to be accepted by everyone as a matter of course.

◼ We conclude that the objections to the proposed action of the city of Bend, while undoubtedly advanced in good faith, are, in the light of constitutional principles, tenuous; that the measure bears only remotely, if at all, upon the religious practices of any individual or the authority of parents to rear their children and prepare them for citizenship; that it was adopted for the accomplishment of an end, concededly legitimate, by means which it would be extravagant to pronounce unreasonable or arbitrary. It is, therefore, a valid exercise of the city's police power.

◼ The only other contention of the plaintiff which we are required to notice is that fluoridation of the city's water supply will constitute a violation of the contractual rights of approximately 600 suburban water users living in water districts with which the city has entered into contracts to furnish pure, potable and palatable water. We think that it is sufficient to say of this contention that the present plaintiff has no standing to raise it.

The decree of the circuit court is affirmed without costs to any of the parties.