JOHN F. KENNEDY MEMORIAL HOSPITAL, PLAINTIFF-RESPONDENT, v. DELORES HESTON AND JANE HESTON, DEFENDANTS-APPELLANTS.

Argued February 8, 1971—Decided July 13, 1971.

*Mr. James G. Aiken* argued the cause for appellants (*Messrs. Aiken and Lake,* attorneys).

*Mr. Morris W. Pinsky* argued the cause for respondent (*Messrs. Toll, Friedman and Pinsky,* attorneys).

The opinion of the Court was delivered by

WEINTRAUB, C. J. Delores Heston, age 22 and unmarried, was severely injured in an automobile accident. She was taken to the plaintiff hospital where it was determined that she would expire unless operated upon for a ruptured spleen and that if operated upon she would expire unless whole blood was administered. Miss Heston and her parents are Jehovah's Witnesses and a tenet of their faith forbids blood transfusions. Miss Heston insists she expressed her refusal to accept blood, but the evidence indicates she was in shock on admittance to the hospital and in the judgment of the attending physicians and nurses was then or soon became disoriented and incoherent. Her mother remained adamant in her opposition to a transfusion, and signed a release of liability for the hospital and medical personnel. Miss Heston

did not execute a release; presumably she could not. Her father could not be located.

Death being imminent, plaintiff on notice to the mother made application at 1:30 A.M. to a judge of the Superior Court for the appointment of a guardian for Miss Heston with directions to consent to transfusions as needed to save her life. At the hearing, the mother and her friends thought a certain doctor would pursue surgery without a transfusion, but the doctor, in response to the judge's telephone call, declined the case. The court appointed a guardian with authority to consent to blood transfusions "for the preservation of the life of Delores Heston." Surgery was performed at 4:00 A.M. the same morning. Blood was administered. Miss Heston survived.

Defendants then moved to vacate the order. Affidavits were submitted by both sides. The trial court declined to vacate the order. This appeal followed. We certified it before argument in the Appellate Division.

The controversy is moot. Miss Heston is well and no longer in plaintiff's hospital. The prospect of her return at some future day in like circumstances is too remote to warrant a declaratory judgment as between the parties. Nonetheless, the public interest warrants a resolution of the cause, and for that reason we accept the issue. *State v. Perricone,* 37 *N. J.* 463, 469 (1962), *cert.* denied, 371 *U. S.* 890, 83 S. Ct. 189, 9 *L. Ed.* 2d 124 (1962).

In *Perricone,* we sustained an order for compulsory blood transfusion for an infant despite the objection of the parents who were Jehovah's Witnesses. In *Raleigh Fitkin-Paul Morgan Memorial Hospital v. Anderson,* 42 *N. J.* 421 (1964), *cert.* denied, 377 *U. S.* 985, 84 *S. Ct.* 1894, 12 *L. Ed.* 2d 1032 (1964), it appeared that both the mother, a Jehovah's Witness, and the child she was bearing would die if blood were not transfused should she hemorrhage. We held that a blood transfusion could be ordered if necessary to save the lives of the mother and the unborn child. We said (42 *N. J.* at 423):

> We have no difficulty in so deciding with respect to the infant child. The more difficult question is whether an adult may be compelled to submit to such medical procedures when necessary to save his life. Here we think it is unnecessary to decide that question in broad terms because the welfare of the child and the mother are so intertwined and inseparable that it would be impracticable to attempt to distinguish between them with respect to the sundry factual patterns which may develop. The blood transfusions (including transfusions made necessary by the delivery) may be administered if necessary to save her life or the life of her child, as the physician in charge at the time may determine.

The case at hand presents the question we thus reserved in *Raleigh Fitkin-Paul Morgan Memorial Hospital.*

 It seems correct to say there is no constitutional right to choose to die. Attempted suicide was a crime at common law and was held to be a crime under *N. J. S. A.* 2A:85–1. *State v. Carney,* 69 *N. J. L.* 478 (Sup. Ct. 1903) ; but see *Campbell v. Supreme Conclave Improved Order Heptasophs,* 66 *N. J. L.* 274, 283 (E. & A. 1901). It is now denounced as a disorderly persons offense. *N. J. S. A.* 2A:170–25.6. Ordinarily nothing would be gained by a prosecution, and hence the offense is rarely charged. Nonetheless the Constitution does not deny the State an interest in the subject.[1] It is commonplace for the police and other citizens, often at great risk to themselves, to use force or stratagem to defeat efforts at suicide, and it could hardly be said that thus to save someone from himself violated a right of his under the Constitution subjecting the rescuer to civil or penal consequences.

 Nor is constitutional right established by adding that one's religious faith ordains his death. Religious beliefs are absolute, but conduct in pursuance of religious beliefs is not wholly immune from governmental restraint. *Mountain Lakes Bd. of Educ. v. Maas,* 56 *N. J. Super.* 245 (App. Div. 1959), aff'd, 31 *N. J.* 537 (1960), *cert.* denied, 363 *U. S.*

---

[1] The Legislature mandated the use of protective devices by motorcyclists in *N. J. S. A.* 39:3–76.7, upheld in *State v. Krammes,* 105 *N. J. Super.* 345 (App. Div. 1969), certif. denied, 54 *N. J.* 257 (1969) ; *State v. Mele,* 103 *N. J. Super.* 353 (Cty. Ct. 1968).

843, 80 S. Ct. 1613, 4 *L. Ed.* 2d 1727 (1960) (vaccination of children); *State v. Massey*, 229 *N. C.* 734, 51 *S. E.* 2d 179 (Sup. Ct. 1949), appeal dismissed for want of substantial federal question, *sub nom. Bunn v. North Carolina*, 336 *U. S.* 942, 69 *S. Ct.* 813, 93 *L. Ed.* 1099 (1949) (the use of snakes in a religious ritual); *Baer v. City of Bend*, 206 *Or.* 221, 292 *P.* 2d 134 (1956) (fluoridation of drinking water). Of immediate interest is *Reynolds v. United States*, 98 *U. S.* 145, 25 *L. Ed.* 244 (1878), in which it was held that Congress could punish polygamy in a territory notwithstanding that polygamy was permitted or demanded by religious tenet, and in which the Court said (25 *L. Ed. p.* 250):

> * * * Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices. Suppose one believed that human sacrifices were a necessary part of religious worship, would it be seriously contended that the civil government under which he lived could not interfere to prevent a sacrifice? Or if a wife religiously believed it was her duty to burn herself upon the funeral pile of her dead husband, would it be beyond the power of the civil government to prevent her carrying her belief into practice?

Complicating the subject of suicide is the difficulty of knowing whether a decision to die is firmly held. Psychiatrists may find that beneath it all a person bent on self-destruction is hoping to be rescued, and most who are rescued do not repeat the attempt, at least not at once. Then, too, there is the question whether in any event the person was and continues to be competent (a difficult concept in this area) to choose to die. And of course there is no opportunity for a trial of these questions in advance of intervention by the State or a citizen.

Appellant suggests there is a difference between passively submitting to death and actively seeking it. The distinction may be merely verbal, as it would be if an adult sought death by starvation instead of a drug. If the State may interrupt one mode of self-destruction, it may with equal au-

thority interfere with the other. It is arguably different when an individual, overtaken by illness, decides to let it run a fatal course. But unless the medical option itself is laden with the risk of death or of serious infirmity, the State's interest in sustaining life in such circumstances is hardly distinguishable from its interest in the case of suicide.

Here we are not dealing with deadly options. The risk of death or permanent injury because of a transfusion is not a serious factor. Indeed, Miss Heston did not resist a transfusion on that basis. Nor did she wish to die. She wanted to live, but her faith demanded that she refuse blood even at the price of her life. The question is not whether the State could punish her for refusing a transfusion. It may be granted that it would serve no State interest to deal criminally with one who resisted a transfusion on the basis of religious faith. The question is whether the State may authorize force to prevent death or may tolerate the use of force by others to that end. Indeed, the issue is not solely between the State and Miss Heston, for the controversy is also between Miss Heston and a hospital and staff who did not seek her out and upon whom the dictates of her faith will fall as a burden.

Hospitals exist to aid the sick and the injured. The medical and nursing professions are consecrated to preserving life. That is their professional creed. To them, a failure to use a simple, established procedure in the circumstances of this case would be malpractice, however the law may characterize that failure because of the patient's private convictions. A surgeon should not be asked to operate under the strain of knowing that a transfusion may not be administered even though medically required to save his patient. The hospital and its staff should not be required to decide whether the patient is or continues to be competent to make a judgment upon the subject, or whether the release tendered by the patient or a member of his family will protect them from civil responsibility. The hospital could hardly avoid the problem by compelling the removal of a dying patient,

and Miss Heston's family made no effort to take her elsewhere.

When the hospital and staff are thus involuntary hosts and their interests are pitted against the belief of the patient, we think it reasonable to resolve the problem by permitting the hospital and its staff to pursue their functions according to their professional standards. The solution sides with life, the conservation of which is, we think, a matter of State interest. A prior application to a court is appropriate if time permits it, although in the nature of the emergency the only question that can be explored satisfactorily is whether death will probably ensue if medical procedures are not followed. If a court finds, as the trial court did, that death will likely follow unless a transfusion is administered, the hospital and the physician should be permitted to follow that medical procedure.

The precedents are few. They are collected in an annotation, 9 *A. L. R. 3d* 1391 (1966). With one exception, *Erickson v. Dilgard,* 44 *Misc. 2d* 27, 252 *N. Y. S. 2d* 705 (Sup. Ct. 1962), transfusions for adults were ordered despite their religious tenets. *Application of President and Directors of Georgetown College, Inc.,* 118 U. S. App. D. C. 80, 331 *F. 2d* 1000 (D. C. Cir. 1964), rehearing en banc denied, 118 U. S. App. D. C. 90, 331 *F. 2d* 1010 (D. C. Cir. 1964), *cert.* denied, 377 *U. S.* 978, 84 S. Ct. 1883, 12 *L. Ed. 2d* 746 (1964); *United States v. George,* 239 *F. Supp.* 752 (D. Conn. 1965); *Collins v. Davis,* 44 *Misc. 2d* 622, 254 *N. Y. S. 2d* 666 (Sup. Ct. 1964); *Powell v. Columbian Presbyterian Medical Center,* 49 *Misc. 2d* 215, 267 *N. Y. S. 2d* 450 (Sup. Ct. 1965).

Two cases reached an appellate level. In *Georgetown College, supra,* a single judge of the Court of Appeals ordered the transfusion. Thereafter a majority of the court denied a petition for rehearing en banc, without however indicating the precise basis for that denial. One dissenting opinion approached the merits. The sole appellate decision expressly reaching the merits appears to be *In re Estate of*

*Brooks,* 32 *Ill.* 2d 361, 205 *N. E.* 2d 435 (Sup. Ct. 1965). There a conservator was appointed to authorize the transfusion for a Jehovah's Witness. After the transfusion, the patient and her husband sought unsuccessfully to have the order expunged. The Supreme Court of Illinois reversed. The court could find no "clear and present danger" warranting interference with the patient's religious proscription. It has been suggested that the "clear and present danger" test, appropriate with respect to free speech, is not the appropriate criterion here, and that the relevant question is whether there is a "compelling State interest" justifying the State's refusal to permit the patient to refuse vital aid. 44 *Texas L. Rev.* 190 (1965). We think the latter test is the correct one, but it cannot be said with confidence that *Brooks* would have gone the other way if the decision had been made in its light. In fact the court there did mention conceivable interests. Thus it noted that the patient did not have minor children who might become charges of the State. But the court did not expressly consider whether the State had an interest in sustaining life, a consideration which would not be apparent when the focus is upon a "clear and present danger." Nor did the court consider the sufficiency of the interest of a hospital or its staff when the patient is thrust upon them. In fact there the applicant was the patient's regular physician who had long treated her for an ulcer, knew of her religious tenet, and had assured her that he would not administer blood. The court noted, too, a fact of uncertain force in its decision, that the application was made to the trial court without notice to the patient or her husband, although time was adequate to that end.

It is not at all clear that *Brooks* would be applied in Illinois to an emergent factual pattern in which a hospital and its staff are the involuntary custodians of an adult. In any event, for the reasons already given, we find that the interest of the hospital and its staff, as well as the State's interest in life, warranted the transfusion of blood under the cir-

cumstances of this case. The judgment is accordingly affirmed. No costs.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For reversal*—None.