206 N.J. Super. 103 (1985)
501 A.2d 1040
RENEE IAFELICE, AN INFANT BY HER GUARDIAN AD LITEM, ANTHONY IAFELICE, ANTHONY IAFELICE, INDIVIDUALLY AND MADONNA IAFELICE, PLAINTIFFS,
v.
SAUL M. LUCHS, M.D., RICHARD MANSFIELD, M.D., ILANA W. ZARAFU, M.D., NEWARK BETH ISRAEL MEDICAL CENTER, PO-I TSENG, M.D., SARVESH K. NIGAM, M.D., NICOLE COHEN-ADDAD, M.D., JOYCE CHUACHINGO, JOHN OR JANE CALABRESE, FIRST NAME FICTITIOUS, PALISADES GENERAL HOSPITAL, ISABEL LISA, R.N., DORAIKANNU BALAKUMAR, M.D., SAYED M.K. UDDIN, M.D., PALISADES ANESTHESIA GROUP, P.A., ABBOTT J. KRIEGER, M.D., EDWARD ANTONIO, M.D., ANTHONY EMANUEL, M.D., AND TELLY DE MESA, M.D., DEFENDANTS.
Superior Court of New Jersey, Law Division Hudson County.
Decided August 6, 1985.
*104 Harvey I. Marcus for plaintiffs.
David P. Weeks for defendant Ilana W. Zarafu, M.D. (Shanley & Fisher, attorneys).
Barbara Billig for defendants Newark Beth Israel Medical Center, Po-I Tseng, M.D., and Nicole Cohen-Addad, M.D. (Feuerstein, Sachs, Maitlin, Rosenstein & Fleming, attorneys).
Peter L. Korn for defendants Abbot J. Krieger, M.D., Edward Antonio, M.D., Anthony Emanuel, M.D., and Telly deMesa, M.D. (McDonough, Murray & Korn, attorneys).

OPINION
YOUNG, J.S.C.
In discharging the duty of informed consent, is a physician negligent in failing to inform parents of a newborn infant manifesting a life-threatening condition, namely hydrocephalus secondary to intraventricular hemorrhage, that they had the alternative of non-treatment and letting the baby die? That is the issue presented on motions for summary judgment filed on behalf of defendants, Newark Beth Israel Medical Center and *105 the physicians who treated the infant at that hospital, Drs. Ilana W. Zarafu, Po-I Tseng, Nicole Cohen-Addad, Krieger, Antonio, deMesa and Emanuel. The resolution of that issue requires an inquiry into legal duty as of the time relevant, namely November 1980, which invokes application of the reasoning and determination set forth in In re Quinlan, 70 N.J. 10 (1976), modifying 137 N.J. Super. 227 (Ch.Div. 1975), cert. denied sub nom., Garger v. New Jersey, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976).[1]
Renee Iafelice was born four weeks prematurely on October 2, 1980 at Palisades General Hospital, North Bergen. Renee weighed 2 lbs. 14.5 ounces and manifested severe respiratory distress, which required mechanical ventilation through an endotracheal tube. On the same day Renee was transferred to the Neonatal Intensive Care Unit at Newark Beth Israel Medical Center, a facility designated Level Three Teritary Center for Perinatology. Defendant, Dr. Ilana W. Zarafu, Director of Neonatology, undertook care of the infant, assisted by Drs. Antonio and deMesa, fellows in the same field, and by Dr. Emanuel, a resident in pediatrics. Diagnosis of hyperbilirubinemia, hyaline membrane disease, and lung congestion were treated with exchange transfusion, Indomethacin, and insertion of a replogle tube in the stomach to prevent distention with air or fluid. That treatment was rendered with the consent of the parents. The infant responded well to that treatment, for by October 29 she had been off the respirator for three weeks and had been breathing very well on her own.
On October 29, 1980, at the age of four weeks, a diagnosis of intraventricular hemorrhage and secondary hydrocephalus was confirmed. It is undisputed that untreated hydrocephalus *106 causes increasing head size, intracranial pressure, brain damage and death. Following a consult on October 31 by Dr. Abbott J. Krieger, attending in neurosurgery, he performed an emergency tap of the ventricle in the brain to relieve pressure on November 6. On November 10 a ventriculoperitoneal shunt was inserted by Dr. Krieger following discussions with a neonatologist, a neurosurgeon and Renee's parents. Dr. Zarafu discussed the proposed surgery with Renee's parents during which they were advised that the situation was serious, that the child would not be normal and that she would likely die if no treatment were rendered. Renee's father signed a written consent form. The surgery was successfully performed. The infant left the Newark Beth Israel Medical Center December 23 and has been institutionalized ever since with severe neurological deficits.
Dr. Zarafu concedes that she did not counsel Renee's parents prior to the proposed surgery of November 10 that they had the option of non-treatment nor did the physician inform the parents that they could oppose the proposed treatment and compel the physicians and the hospital to resort to the courts for authorization. Moreover, plaintiffs' expert, Dr. Franklin Desposito, of the University of Medicine and Dentistry of New Jersey, concedes that the quality of care rendered Renee met the highest standards of medicine and that the shunt procedure "was not an inappropriate form of treatment," but on the contrary, "a perfectly reasonable form of treatment." (Tr. 30.10-17) Indeed, Dr. Desposito volunteered that "I would dare say that Renee in many other intensive care units would not have survived." However ironic it may seem, plaintiffs point to the survival of their child as proof of damage. The gravamen of plaintiffs' complaint is that the doctrine of informed consent obligated Dr. Zarafu to inform them of the option of non-treatment. The parents expressed not only the intent that Renee be free from medical intervention, but that *107 she be allowed to die.[2]Cf., Matter of Conroy, 98 N.J. 321, 355 (1985). All counsel stipulate that there is no factual issue outstanding and submit on the issue of the legality of plaintiffs' presuppositions.
The deposition testimony of plaintiffs' expert, Dr. Desposito, reflects not only the subjective quality of the standard he postulates, but his uncertainty thereof from a legal point of view.
Q. Now, are you saying that because she [Dr. Zarafu] did not tell the parents that they had the option to withold the consent or that they had an option to let the baby die, that thereby under the facts of this case she departed from the accepted standards of medical care required of neonatologists?

*108 A. It's a yes  I hear you.
Q. That's why we're here.
A. And I'm having difficulty in terms of responding to you. I would feel, again personally, that one has that obligation of outlining that. Is that, if I may, is that part of what's accepted in terms of informing consent (sic!) and I don't know how to answer from a legal point of view because I don't know what the legal, all of the legal aspects of the informed consent are.
* * * * * * * *
A.... I think, I think that the informed consent process is not fully met unless all of the options are laid out.
* * * * * * * *
Q. Since that was an overwhelming likelihood, I put it to you that the question becomes did the parents of Renee really have available to them the option of withholding consent so that their baby thereby could die sooner or later? Was that an option they really had?
A. I believe so, and the approach that I would take, again a personal one. (TR. 13:21  14.11; 16:2  4; 17:17  24)
Dr. Desposito's opinion that "the informed consent process was substandard in this case" is more formally expressed in his report of May 30, 1984:
During the informed consent process, all available options should be discussed including the option not to have the procedure. Specifically, the shunt is only palliative; it would not correct any existent brain damage and to prevent the head from becoming so large that it would be an added burden to nursing care. It might also allow the baby to survive. The consequences of non-shunting would probably be death within a few months or the survival of an even more extensively damaged child with an enlarging, even grotesque head ... such infants may survive for several years. Such consequences have been outlined in my previous note and are in accordance with Dr. Zarafu's testimony (page 130).
In opposition is the opinion of Dr. Zarafu's expert, Dr. Frank Manginello, Associate Director, Perinatal Center, Director of Research and Education, St. Joseph's Hospital and Medical Center, Paterson. His views will serve as a predicate for the application of the standards announced in the Quinlan case. Dr. Manginello notes in his report of January 10, 1985 that if a neonate has suffered a grade three hemorrhage, the chance for a normal outcome will be at least 50% whether or not hydrocephalus accompanies the hemorrhage.

*109 If the hemorrhage had been a grade four, that is with blood into the substance of the brain itself, the chance for a normal outcome is far less, generally 10 to 20% but there is no way to predict whether impairments will be mild, moderate or severe, strictly based on neonatal examinations and the extent of the hemorrhage alone. Given these statistics and the fact that this patient was neither comatose nor brain dead, a proper course would be to preserve as much function as possible in the baby, with treatment of the obstructive hydrocephalus in a timely manner, and to inform the patient's parents that long term handicaps were a possibility. I do believe from reading the parents depositions that they did remember that the chance for future handicaps was discussed with them and that no one could determine the extent of the handicaps at the present time. Since Dr. Zarafu must always remain as the infant's advocate, her primary function, I believe is to inform the parents of their child's condition and to offer the best possible means of correcting the problems. It would have been improper to withold therapy for this child based on the hemorrhage alone, since there was no evidence of this child being either brain dead or in irreversible coma.
Had the parents opted for termination of treatment and therefore early death for this child, it is doubtful that any institutional review board or prognosis committee would have allowed this. The feeling of the institutional review board is that there must be no reasonable hope of a patient returning to a sapient or cognitive existence before care can be terminated.
* * * * * * * *
I believe that Dr. Zarafu's care was appropriate at all times and did not deviate from accepted standards.
An appropriate point of departure is to note that any duty imposed upon a defendant, whether in medical malpractice actions or in other actions sounding in negligence, must be a duty sanctioned by our law, whether statutory or decisional. See Sesselman v. Muhlenberg Hospital, 124 N.J. Super. 285, 289-290 (App.Div. 1973). Expressed in other terms, the theory of liability must be sufficient in law, failing which a defendant is entitled to a judgment of dismissal. See Fernandez v. Baruch, 52 N.J. 127, 130 (1968). This is preface to the preliminary determination that plaintiffs' expert, in postulating the standard of care in the profession, expressed in the excerpts noted above, his "personal feelings," and "the approach that I would take, again a personal one." As the Supreme Court has stated, "The expert testimony must relate to generally accepted medical standards, not merely to standards personal to the witness." Id. at 131, citing Carbone v. Warburton, 11 N.J. *110 418, 425 (1953); Schueler v. Strelinger, 43 N.J. 330, 346 (1964). See also In re Hyett, 61 N.J. 518, 531 (1972); Fantini v. Alexander, 172 N.J. Super. 105, 110 (App.Div. 1980). Judge Newman recently had occasion to address the question in the context of a claim of educational malpractice in Swidryk v. Saint Michael's Med. Ctr., 201 N.J. Super. 601 (Law Div. 1985):
In order to find a defendant liable for negligence, a legal duty must be found to exist and there must have been a breach of that duty. Fortugno Realty Co. v. Schiavone-Bonomo Corp., 39 N.J. 382, 392 (1963), McIntosh v. Milano, 168 N.J. Super. 466 (Law Div. 1979). Whether or not a duty exists is ultimately a question of fairness and the inquiry involves a consideration of the relationship of the parties, the nature of the risk and the public interest in the proposed solution. Essex v. New Jersey Bell Telephone Company, 166 N.J. Super. 124 (App.Div. 1979). Public policy considerations must play a major role in the determination of whether or not a legal duty exists. See Wytupeck v. Camden, 25 N.J. 450, 462 (1957). [Id. at 606.]
All of the considerations identified by Judge Newman have been accorded significance in this unsettled field of medical jurisprudence, giving rise to questions of constitutional dimensions. The references here to the burgeoning literature will be limited to the aspect of informed consent. The pre-Quinlan decisional law, with particular reference to informed consent as well as to cases that involve the fate of a child, will establish a basis for comparison with that landmark decision.
The Court refused to recognize a cause of action predicated upon "wrongful life" when it was alleged that an obstetrician failed to inform a mother of the possibility that her child would be born with birth defects so that she could then choose to have an abortion. Gleitman v. Cosgrove, 49 N.J. 22 (1967). The issues there submitted find close parallels to those in the case at bar. The rationale rested upon public policy grounds including the conclusion that the physician's conduct would not give rise to damages cognizable at law. "Though we symphathize with the unfortunate situation in which these parents find themselves, we firmly believe the right of their child to live is greater than and precludes their right not to endure emotional and financial injury." Id. at 31.
*111 The reasoning and holding of John F. Kennedy Memorial Hospital v. Heston 58 N.J. 576 (1971), are significant for the emphasis they placed upon the interest of the state in sustaining life. As will presently be noted, whatever principles the Quinlan opinion may be cited for, that case reiterated and reaffirmed the viability of that interest, which may be overridden only "under certain circumstances." In Heston, the mother of a 22-year-old daughter injured in an auto accident refused to consent to treatment on religious grounds. The hospital determined that lacking treatment the patient would expire. The Court held that the interest of the hospital and its staff, as well as the state's interest in life, warranted the administration of a blood transfusion. The reasoning as expressed by Chief Justice Weintraub will serve as points of reference to subsequent pronouncements on the subject under review:
It seems correct to say that there is no constitutional right to choose to die.
* * * * * * * *
Hospitals exist to aid the sick and the injured. The medical and nursing professions are consecrated to preserving life. That is their professional creed. To them, a failure to use a simple, established procedure in the circumstances of this case would be malpractice, however the law may characterize that failure because of the patient's private convictions.
* * * * * * * *
The hospital and its staff should not be required to decide whether the patient is or continues to be competent to make a judgment upon the subject, or whether the release tendered by the patient or a member of the family will protect them from civil responsibility.
* * * * * * * *
The solution sides with life, the conservation of which is, we think, a matter of State interest.
* * * * * * * *
A prior application to a court is appropriate if time permits it, although in the nature of the emergency, the only question that can be explored satisfactorily is whether death will probably ensue if medical procedures were not allowed. [58 N.J. at 580; 582; 583.]
The Heston opinion answered the question left open by Raleigh Fitkin-Paul Morgan Mem. Hosp. v. Anderson, 42 N.J. 421 (1964), cert. den. 377 U.S. 985, 84 S.Ct. 1894, 12 L.Ed.2d *112 1032 (1964). It appeared that both mother and her unborn child would die but for surgical intervention and a blood transfusion. A unanimous Supreme Court, reversing the trial court, sanctioned the treatment. "We have no difficulty in so deciding with respect to the infant child. The more difficult question is whether an adult may be compelled to submit to such medical procedures when necessary to save his life. Here we think it is unnecessary to decide that question in broad terms because the welfare of the child and the mother are so intertwined and inseparable...." Id. at 423.
Did the Quinlan opinion change the duty that establishes a physician's legal obligations to his patient in the area of informed consent? Plaintiffs here interpret that opinion as giving rise to a legally-sanctioned option of non-treatment for their infant, which when not offered by the physician will subject her to civil liability. This court does not agree for the reasons here stated.
In Quinlan the father of a 21-year-old daughter, described as being "in a persistent vegetative state," moved for an order to be appointed guardian and for power to authorize the discontinuance of all extraordinary procedures for sustaining her vital processes. The Chancery Division denied both requests. The Supreme Court modified and remanded, directing that letters of guardianship be granted, and outlined instructions and guidelines pursuant to which "the present life-support system may be withdrawn and such action shall be without civil or criminal liability on the part of any participant, whether guardian, physician, hospital or others." 70 N.J. at 55. The "unwritten constitutional right of privacy" was considered to be "broad enough to encompass a patient's decision to decline medical treatment under certain circumstances," even if that decision might lead to the patient's death. Id. at 40. Furthermore, if the patient himself was not competent to make that decision, a surrogate could do so in his stead.
*113 The Court distinguished Heston, supra, in the paragraph here quoted:
We have no doubt, in these unhappy circumstances, that if Karen were herself miraculously lucid for an interval (not altering the existing prognosis of the condition to which she would soon return) and perceptive of her irreversible condition, she could effectively decide upon discontinuance of the life-support apparatus, even if it meant the prospect of natural death. To this extent we may distinguish Heston, supra, which concerned a severely injured young woman (Delores Heston) whose life depended on surgery and blood transfusion; and who was in such extreme shock that she was unable to express an informed choice (although the Court apparently considered the case as if the patient's own religious decision to resist transfusion were at stake) but most importantly, a patient apparently salvable to long life and vibrant health;  a situation not at all like the present case. [Id. at 39.][3]
Chief Justice Hughes recognized that the institution of life-sustaining procedures are "ordinarily mandatory," but that they may become a matter of medical discretion in the context of administration to persons in extremis. Id. at 43. In resolving the "dilemma" the Court took judicial notice that many physicians "have refused to inflict an undesired prolongation of the process of dying on a patient in irreversible condition when it is clear that such `therapy' offers neither human nor humane benefit." Id. at 47. The fulcrum upon which the decision turned was the prognosis of the patient.
The evidence in this case convinces us that the focal point of decision should be the prognosis as to the reasonable possibility of return to cognitive and sapient life, as distinguished from the forced continuance of that biological vegetative existence to which Karen seems to be doomed. [Id. at 51.]
In reading the lengthy Quinlan opinion, it is easy to overlook the fact that the principle of the state's general interest in preserving life was reaffirmed and reiterated. An overriding of that general interest will be sanctioned "under certain circumstances," such as to recognize an individual's personal right to control her own body and life. 70 N.J. at 40-41. Indeed, in *114 three retrospectives on Quinlan afforded by Berman v. Allan, 80 N.J. 421 (1979), In re Grady, 85 N.J. 235 (1981) and most recently in Matter of Conroy, 98 N.J. 321 (1985), the Supreme Court acknowledged the state's interest in preserving life, in the last-noted opinion stating: "Whether based on common-law doctrines or on constitutional theory, the right to decline life-sustaining treatment is not absolute. In some cases, it may yield to countervailing societal interests in sustaining the person's life." Id. at 348.
Berman v. Allan, supra, held that physicians could not be held liable in negligence founded upon "wrongful life" on the claim that had they informed an infant's mother during her pregnancy of the availability of the amniocentesis procedure, the mother would have submitted to such a procedure, and had she been told that the child, if born, would suffer from Down's Syndrome would have had the fetus aborted. At the same time the Court upheld a cause of action founded upon "wrongful birth" because the mother had been deprived of the option of making a meaningful decision as to whether to abort the fetus. In language equally applicable to the case at bar, the Court made reference to the charters of our constitutional system and wrote:
One of the most deeply held beliefs of our society is that life  whether experienced with or without a major physical handicap  is more precious than non-life. See In re Quinlan, 70 N.J. 10, 19 & n. 1 (1976). Concrete manifestations of this belief are not difficult to discover. The documents which set forth the principles upon which our society founded are replete with references to the sanctity of life. * * * Nowhere in these documents is there to be found an indication that the lives of persons suffering from physical handicaps are to be less cherished than those of non-handicapped human beings.
* * * * * * * *
Finally, we would be remiss if we did not take judicial notice of the high esteem which our society accords those involved in the medical profession. The reasons for this is clear. Physicians are the preservers of life.
* * * * * * * *
We recognize that as a mongoloid child, Sharon's abilities will be more circumscribed than those of normal, healthy children and that she, unlike them, will experience a great deal of physical and emotional pain and anguish. We *115 sympathize with her plight. We cannot, however, say that she would have been better off had she never been brought into the world.... To rule otherwise would require us to disavow the basic assumption upon which our society is based. This we cannot do. [80 N.J. at 429, 430.]
In re Grady, supra, presented the question of under what conditions a court should appoint a guardian who may authorize the sterilization of a woman who was severely mentally impaired. In protecting the "best interests" of the incompetent, Justice Pashman, writing for the Court, noted that "It must be the court's judgment, and not just the parents' good faith decision, that substitutes for the incompetent's consent." 85 N.J. at 251. The Grady opinion is significant to the case at bar for its emphasis upon the right of the state to deny to parents the power of life or death over their children or other incompetents.
The parens patriae power of our courts derives from the inherent equitable authority of the soverign to protect those persons within the state who cannot protect themselves because of an innate legal disability.
* * * * * * * *

Parens patriae jurisdiction has been invoked in cases involving substituted consent for medical procedures. The most common of these occurs when a court authorizes a blood transfusion over the objections of an injured or sick child's parents. State v. Perricone, 37 N.J. 463, 475 cert. denied., 371 U.S. 890, 83 S.Ct. 189, 9 L.Ed.2d 124 (1962); Muhlenberg Hosp. v. Patterson, 128 N.J. Super. 498 (Law Div. 1974).... [85 N.J. at 259-60.]
Lastly, in Matter of Conroy, supra, while recognizing the strong state interest in life, the Court carved out the right of a competent person to decline life-sustaining medical treatment for himself. However, when the case involves the protection of an actual or potential life that cannot actually protect itself, the interest of the state in sustaining life is given effect, citing the cases of Perricone, supra, and Patterson, supra, as well as Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). 98 N.J. at 349.
The trial court must apply the guidelines here collated, and while the lodestars do not shine as brightly as one would wish, their intensity is sufficient to plot a course. This court places reliance upon the long-standing solicitude that our law has *116 accorded infants, with the post-Quinlan expressions of Berman v. Allan, supra, providing an eloquent reference. Noting that "life ... is more precious than non-life," the Court observed of a mongoloid child, "[W]e cannot, however, say that she would have been better off had she never been brought into the world." 80 N.J. at 430. By extrapolation the same could be said for Renee Iafelice, into five weeks of life.
Assuming arguendo that Quinlan applies here, the factual context is vastly different.[4] Only if non-intervention were opted for could the infant's continued deterioration be plainly projected to result in death. There was a reasonable medical probability that the hydrocephalus could be arrested and the infant emerge with minimal brain damage. The treatises document an increasingly higher success rate for control of hydrocelphalus. "Since the introduction of valve-regulated shunts more than 25 years ago, the outlook for patients with neonatal hydrocephalus has improved greatly. As experience has grown, the morbidity and mortality of these operations have been greatly reduced and the 5-year survival rate (unselected series) now approaches 90%." Milhorst, T.H., "Disorders of Neurosurgical Importance," Ch. 40 Neonatology, 2d ed., Avery, Ed., p. 967. Another authority writes: "In summary, when comparing the outcome of untreated infantile hydrocephalus *117 patients with that of those managed surgically, there is little doubt that the results are better in the treated groups, in whom the immediate success rate for control of hydrocephalus is in the range of 70 per cent. (Yeshon, 1963)." Avery and Taeusch, Schaffer's Diseases of the Newborn, 5th ed. (1984), p. 698. If the "focal point of decision should be the prognosis," as the Supreme Court postulated in the Quinlan opinion, 70 N.J. at 51, then the preponderance of statistical experience pointed to surgical intervention in the case of Renee Iafelice.
The measures undertaken for the Iafelice infant were designed to save the child's life. Applying the classification described by Chief Justice Hughes in Quinlan, Dr. Zarafu and her associates in their ministrations to Renee could be described as physicians dedicated to "curing the ill" and who "refuse to treat the curable as if they were dying or ought to die...." 70 N.J. at 47.
Although not controlling, the opinion of the Court of Appeals of the State of New York in Matter of Storar, 52 N.Y.2d 363, 420 N.E.2d 64, 438 N.Y.S.2d 266 cert. den. 454 U.S. 858, 102 S.Ct. 309, 70 L.Ed.2d 153 (1981), is informative. A state official applied for authority to continue blood transfusions to a profoundly retarded 52-year old patient in a state facility who suffered from terminal cancer. Reversing both trial and intermediate appellate courts, which upheld the refusal of the patient's mother to continue the transfusions, the Court of Appeals wrote:
Mentally John Storar was an infant and that is the only realistic way to assess his rights in this litigation....
A parent or guardian has a right to consent to medical treatment on behalf of an infant (Public Health Law, § 2504, subd. 2). The parent, however, may not deprive a child of life saving treatment, however well intentioned. (Citations omitted). Even when the parents' decision to decline necessary treatment is based on constitutional grounds, such as religious beliefs, it must yield to the State's interests, as parens patriae, in protecting the health and welfare of the child (citations omitted). Of course it is not for the courts to determine the most `effective' treatment when the parents have chosen among reasonable alternatives (citation omitted). But the courts may not permit a parent to deny a child all treatment for a condition which threatens his life (citations omitted). The case of a child who may bleed to death because of the parents' refusal to *118 authorize a blood transfusion presents the classic example (citation omitted). [420 N.E.2d at 73, 438 N.Y.S.2d at 275.]
The Court of Appeals also ruled that it was optional for physicians charged with the care of incompetent persons to apply to the courts for a ruling prior to acting. Id. 420 N.E.2d at 74, 438 N.Y.S.2d at 276; Cf., Quinlan, 70 N.J. at 55.
This court determines that as of the time here relevant, November 1980 and in the circumstances presented, there was no legal duty which obliged the movants to inform the parents of an infant suffering from a life-threatening condition of an alternative to withhold treatment and to let the child die. It is only "the alternatives to that treatment, if any, ...," Perna v. Pirozzi, 92 N.J. 446, 460 (1983), quoting Canterbury v. Spence, 464 F.2d 772, 787-88 (D.C. Cir.) cert. den. 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972), that a physician must present and in the case at bar death was not a legally-sanctioned alternative.
On the authorities cited and the reasoning set forth, the motions for summary judgment of the defendants, Newark Beth Israel Medical Center, Drs. Ilana W. Zarafu, Po-I Tseng, Nicole Cohen-Addad, Abbot J. Krieger, Edward Antonio, Anthony Emanuel, and Telly deMesa are granted. An appropriate form of order may be submitted.
NOTES
[1] The pending motions are not related to the causes of action pleaded against defendants Palisades General Hospital and the attending physicians and other medical personnel at that hospital, against whom there are allegations of negligent prenatal, labor and delivery-room care, which proximately caused brain damage.
[2] Anthony and Madonna Iafelice testified that they knew Renee would die without the implantation of the shunt and that they would have withheld their consent and allowed her to die had they not been denied a choice. The intensity of their feelings is reflected in the excerpts from their depositions here quoted.

Mrs. Iafelice testified as follows:
Q. What did you want done?
A. Natural death. To me, I believe that she would have just died because she didn't have everything working. (Tr. XXX-XX-XX)
* * * * * * * *
Q. What made you think these things were done to prolong her life?
A. All done to help her, right? Why did they give the transfusions? Because they wanted to help her. Help her what? Help her live. Did she ask me do I want her to live? Did they give me the choice of bringing her home? (Tr. 305:7-12)
Mrs. Iafelice's attention was directed to the hydrocephalus condition of her daughter:
Q. Is it your testimony today that it was not your wish that they treat that condition?
A. Right. (Tr. 374:22  24)
Mr. Iafelice testified to the same position.
Q. If you had full control of the situation and you could have withheld consent 
A. Knowing they couldn't overrule me?
Q. Correct.
A. There is no way they would have done any operation, any surgery. That's the way I felt and I still do.
Q. Is this knowing that Renee would die if the surgery was not performed?
A. That's correct. (Tr. 437:19  438-2)
[3] It was not until 1985, in Matter of Conroy, supra, 98 N.J. at 351, that the Supreme Court, in recognizing the "self-determination" right of a terminally ill person to reject medical treatment, stated: "To the extent that our decision in John F. Kennedy Memorial Hosp. v. Heston, 58 N.J. 576, 581-82 (1971), implies the contrary, we now overrule it."
[4] Commentators disagree as to the applicability of the Quinlan rulings to infants. See Robertson & Fost, "Passive Euthanasia of Defective Newborn Infants: Legal Considerations," 88 J. Pediatrics 883 (1976), who suggest that the rulings do not apply. Contra, Collester, "Death, Dying and the Law: A Prosecutorial View of the Quinlan Case," 30 Rutgers L.Rev. 304, 324 (1977). Indeed, in the most recent pronouncement of the Supreme Court, the applicability of the Quinlan principles to infants was left open.

We have not attempted to set forth guidelines for decision-making with respect to life-sustaining treatment in a variety of other situations that are currently before us. Innumerable variations are possible. However, each case  such as that of the seriously deformed newborn, ...  poses its own unique difficulties. We do not deem it advisable to attempt to resolve all such human dilemmas in the context of this case. It is preferable, in our view, to move slowly and to gain experience in this highly sensitive field. Matter of Conroy, supra, 98 N.J. at 387-388.