471 A.2d 514

## In re Matthew REMLEY.

### Appeal of Matthew REMLEY.

Superior Court of Pennsylvania.

Submitted Oct. 7, 1983.

Filed Jan. 20, 1984.

164

John J. Thomas, Assistant Public Defender, Wilkes-Barre, for appellant.

Ralph J. Johnston, Jr., Wilkes-Barre, for participating party.

Before BROSKY, MONTGOMERY and CERCONE, JJ.

BROSKY, Judge:

■ This appeal is from an order involuntarily committing appellant, an 82 year old man, to a state mental hospital for 20 days under 50 P.S. § 7303. Appellant contends that, contrary to the enabling statute, he was committed because he was senile and not because he posed "a clear and present danger of harm to others or to himself." 50 P.S. 7301(a).[1] We agree and, accordingly, reverse the commitment order.

■ First, we note that although the commitment period in question has long since expired, we will, nonetheless consider it. We do so in order to maintain appellate oversight of this liberty-depriving procedure. "Appeals from orders for involuntary commitment rarely reach this Court within 90 days. Were we to dismiss such appeals as moot, the challenged procedure could continue, yet its propriety would evade our review. Accordingly, we will reach the merits of this case." *In re Ann S.*, 279 Pa.Super. 618, at 621 n. 2, 421 A.2d 370, at 372 n. 2 (1980).

\*    \*    \*

A statute prohibits the commitment of the senile *qua* senile. "... Persons who are mentally retarded, senile, alcoholic, or drug dependent shall receive mental health treatment only if they are also diagnosed as mentally ill, but these conditions of themselves shall not be deemed to constitute mental illness..." 50 P.S. § 7102. The Supreme Court of this Commonwealth has written on the mentally retarded provision. See *In re Schmidt*, 494 Pa. 86, 429 A.2d 631 (1981). It remains for us here to enforce the provision regarding the senile.

Since appellant could not have been properly committed because he was senile, it remains for us to determine if he otherwise met the statutory criteria for involuntary commitment. The relevant statute provides, in relevant part, that

---

**1.** Appellant also contends that the hearing officer violated due process in declaring a 14 day commitment at the end of the hearing and then increasing it in the written order the next day to 20 days. We do not reach this issue due to our reversal of the entire commitment order.

a person who is "severely mentally disabled" may be involuntarily committed. "A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself." 50 P.S. § 7301(a). The statute then amplifies the standard of harm to others. "Clear and present danger to others shall be shown by establishing that within the past 30 days the person has inflicted or attempted to inflict serious bodily harm on another and that there is a reasonable probability that such conduct will be repeated." 50 P.S. § 7301(b)(1).

■ The only testimony of any kind relating in any way to appellant's having inflicted or having attempted to inflict serious bodily injury to others or to a reasonable probability of such actions being repeated is as follows.[2]

He had a knife that he peels, I give him for oranges and apples; he peels them and I trust him with it, they didn't. I did trust him; so anyway I turned around and I want to take it off him and that's when he like he swatted me one—I was gonna swat him back and I give him a push...[3]

The second incident was testified to as follows:

R. JOHNSON:[4] Did he ever kick you in the stomach?
MRS. REMLEY: Well it was this when he did that. Well see I make him go to bed and I cover him up. He'll get up about ten times so I shoved him and that's when he

---

2. Mrs. Remley, the witness quoted here, has been appellant's wife for 60 years.

3. The above testimony was given at the Master's hearing. The testimony given before the Court was substantively identical. "...and so I went to grab it, take the knife off him. Well, maybe I went a little too fast and he sweeped and slapped me in the cheek."

4. Johnson was appellant's counsel.

kicked me. Then he...you know you protect your-self...so... But he didn't kick me that hard.[5]

In general, appellant's wife also stated:

R. JOHNSON: I see, has he threatened you on any occasion?

MRS. REMLEY: No, no, no he's not a guy like that.

. . . . .

R. JOHNSON: Were you injured in any respect?

MRS. REMLEY: No he doesn't (inaudible).[6]

A psychiatric nurse who had been caring for appellant during his pre-hearing stay at a state mental hospital, also testified that appellant had not tried to harm anyone.

We do not hesitate to conclude that there is not a quantum of evidence that appellant inflicted or attempted to inflict *serious bodily injury* —or that there was "a reasonable probability that such conduct will be repeated."

\* \* \*

■■■■ The portion of the statute which defines harm to himself reads in part: [7]

(2) Clear and present danger to himself shall be shown by establishing that within the past 30 days:

(i) the person has acted in such manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that death, serious bodily injury or serious

---

5. At the hearing before the Court Mrs. Remley added only that appellant was lying down and she was standing when the kick in question occurred.

6. There was quoted at the hearing before the Court a statement said to have been made by Mrs. Remley to the MH/MR authorities. In it she allegedly stated that appellant had hit her hand with a pot. At both hearings Mrs. Remley repeatedly denied this.

7. Two other sections following the above quoted section relate to attempted suicide and self-mutilation. There is no evidence whatsoever relating to these provisions.

physical debilitation would ensue within 30 days unless adequate treatment were afforded under this act; or 50 P.S. § 7301(b)(2)(i).

This requirement has two parts. The first relates to his need for the assistance of others. The second, separately necessary, condition is that the most serious consequences must be probable in the immediate future unless the person is committed.

The testimony in general established that appellant did require the domestic services of his wife. (There was some conflict in the testimony about whether appellant could feed or dress himself. But it is clear that appellant needs the help of his wife in the tasks of daily life.)

It is the second condition which was not met here. The statute does not require that everyone who needs the assistance of others should be committed. It does require that they both need such help [8] *and* won't get it without being committed. There was no evidence that appellant would probably die, incur serious bodily injury or serious physical debilitation if he were not committed.

The testimony given on this matter was not on point. The state mental hospital physician was asked whether appellant would "be able to survive if he were released from this hospital *solely on his own*..." (emphasis supplied). He replied in the negative. That was not, however, a pertinent enquiry. The proper issue was whether he could survive without serious ill effects outside of the institution.

The only testimony that went to the possible insufficiency of the care he would receive at home follows:

R. JOHNSON: What if you left him alone, would he wander at all?

MRS. REMLEY: He used to, but no more. He'd like wander cause (INAUDIBLE) but he did once or twice, but

---

8. Of course, their condition must also be due to a severe mental disability.

he hasn't done it in a long time, because I leave him in the house while I feed my little chicks and little ringnecks. I come in, he's in there; lookin' for food.

Again, we do not hesitate to conclude that the statutory standard was not met here.

\*     \*     \*

■ There are indications in the record before us that appellant and his wife were caught in the grasp of well-intentioned officials. But, when the awesome power of the government bureaucracy and the courts is brought to bear on the individual citizen, good intentions are not enough. Even though they may be motivated by a desire to help the individual, the actions of the government must be strictly circumscribed by the law. This is most particularly mandatory when the governmental action involves the deprivation of the citizen's liberty. The courts, in overseeing such liberty-depriving bureaucratic action, must be especially protective of the rights of the individual and vigilant in ensuring that the legal safeguards have been complied with.

As we have noted, the statutory requirements were not met here. To compound matters, it appears that they were not met through a certain degree of overreaching by the officials and by the Court.

MRS. REMLEY: Pardon me, when I was up the hospital they wanted him to sign something, a couple papers and I said to them; "he doesn't know what he's signing, he can't sign that." So then they gave me four papers. Well I want a chance to read what I'm signing. They didn't give me a chance, they just took 'em and that was it. My boy said, I want you to get a copy of that mom, why didn't you call me? I didn't know what, he said well that's alright, well I like the one fella that's there because he really has a heart.

When this assertion was repeated in front of the Court, the following exchange took place:

THE WITNESS: Yes, sir. I know they made me sign this.

THE COURT: Nobody made you sign anything now. They don't make you do things. You do this of your own accord. Have her read her statement there to the Court.

■ Finally, in its opinion, the court below accepted the state physician's diagnosis of senility and wrote:

It is felt by the undersigned, however, that in-patient psychiatric treatment for any period longer than the twenty (20) days ordered herein would not be an appropriate solution to the Respondent's difficult positions.

The Respondent is clearly in need of skilled nursing home care on a continuous basis. Confinement in a state psychiatric hospital for any period in excess of the twenty (20) days would not serve the Respondent's best interests and would not comport with the spirit of the Act.

Therefore, it is further ORDERED that the Social Services Department of Danville State Hospital cooperate with the Respondent's family and the Hazleton-Nanticoke Mental Health/Mental Retardation Center to obtain placement of the Respondent in an appropriate skilled nursing home facility at the end of the twenty (20) day period of in-patient treatment ordered herein. Additionally, referral shall be made to the Area Agency on Aging in the event they can be of some assistance to the Respondent.

The Court below acknowledged that it perceived appellant's needs to be for services other than those provided in a state mental institution. Under these circumstances, confinement, even for 20 days, in that institution was improper.[9]

\*     \*     \*

Order reversed and appellant discharged.

9. We must wonder through what legal authority the Court was going to compel appellant's placement in a nursing home—given both appellant's and his wife's desire that he live at home. There was no incompetency proceeding mentioned.