502 A.2d 1271

In re ESTATE OF Darrell DORONE.

Appeal of William DORON and Carol Doron, Parents and Natural Guardians of Darrell Dorone, a/k/a Darrell Doron.

Superior Court of Pennsylvania.

Argued June 6, 1985.

Filed Dec. 27, 1985.

William R. Bell, Philadelphia, for appellants.

Before SPAETH, President Judge, and McEWEN and BECK, JJ.

SPAETH, President Judge:

 This is an appeal from two orders of the Court of Common Pleas of Lehigh County appointing a temporary guardian to consent to blood transfusions as necessary during emergency surgery on appellants' son, who was a patient at The Lehigh Valley Hospital Center and was unconscious as the result of an automobile accident. Appellants' son was a Jehovah's Witness and had purportedly signed a medical alert card to the effect that for religious reasons he did not wish to be given blood transfusions. Appellants argue that the court should have appointed them as temporary guardians of their son, rather than a hospital administrator, and that the orders authorizing blood transfusions infringed their son's right to self-determination and his First Amendment right to freedom of religion.[1] As it developed, at least one blood transfusion did prove necessary during the surgery. As appellee, the hospital where the surgery was performed argues that appellants have waived all issues by failing to file exceptions to the court's orders. It also argues that the case is moot. We hold that the failure to file exceptions will be excused; that the case is not moot; and that the court's orders did not violate the rights of appellants' son, either to self-determination or freedom of religion. We therefore affirm the orders.

1

We must consider appellee's arguments first, for if all issues have been waived, or the case is moot, that is the end of the matter.

1. We note that appellants' son is not himself a party to this action, and we do not intimate by our ensuing discussion that appellants have standing to raise his First Amendment rights. They do have standing, however, to argue that they should have been appointed their son's temporary guardian, and to decide whether the trial court erred in not appointing them we must consider whether their son's rights were violated; if his rights were not violated, as we conclude they were not, then the court's refusal to appoint appellants his guardian violated no right of appellants.

The trial court issued the orders in response to emergency telephone calls during which the patient's attending surgeon and the assistant hospital administrator said that the patient was unconscious; that he would die unless surgery were immediately performed; that if complications developed during the surgery, he would die without a blood transfusion; but that the patient's parents would not authorize a transfusion. Slip op. of tr. ct. at 1–3. It is not surprising that in these circumstances the orders were terse. The first, dated August 1, 1984, simply appointed a hospital administrator temporary guardian to consent to blood transfusions necessary incident to the surgery to be performed that day. The second, dated August 3, added as a preface the words, "it appearing that failure to appoint a temporary guardian for Darrell Dorone will result in irreparable harm to the alleged incompetent . . . ; " this language tracks the statutory provision under which the trial court acted. Slip op. of tr. ct. at 10; 20 Pa.C.S. § 5513. Neither order conformed to the form contemplated by Pa.R.C.P. 1517, which requires a statement of the issues, a statement of the facts, and a discussion of the questions of law and the court's conclusions.

■ In the circumstances, we do not believe that exceptions to the orders were necessary. When an order neither comports with the requirements of Rule 1517 nor contains a suggestion that exceptions must be filed in order to preserve a right of appeal, the failure to file exceptions will be excused. *Commonwealth v. Derry Township*, 466 Pa. 31, 41–42, 351 A.2d 606, 611 (1976); *Tallon v. Liberty Hose Co. No. 1*, 336 Pa.Super. 530, 534 n. 1, 485 A.2d 1209, 1211 n. 1 (1984); *Storti v. Minnesota Mutual Life Insurance Co.*, 331 Pa.Super. 26, 28–29, 479 A.2d 1061, 1062; *Barton v. Penco*, 292 Pa.Super. 202, 204, 436 A.2d 1222, 1223 (1981). *But see Cornell v. D'Italia*, 287 Pa.Super. 233, 429 A.2d 1186 (1981). Accordingly, appellants' failure to file exceptions did not result in waiver of the issues appellants seek to have us decide.

■■■ The question remains, however, whether these issues have become moot. As a general rule an actual case or controversy must exist at all stages of the judicial process, and a case once "actual" may become moot because of a change of facts. *Pennsylvania Coal Mining Association v. Commonwealth, Department of Environmental Resources*, 498 Pa. 1, 444 A.2d 637 (1982); *Commonwealth v. Joint Bargaining Committee for Pennsylvania Social Services Union*, 484 Pa. 175, 398 A.2d 1001 (1979); *In re Gross*, 476 Pa. 203, 382 A.2d 116 (1978); *Meyer v. Strouse*, 422 Pa. 136, 221 A.2d 191 (1966). An exception is made, however, for cases in which the issues are capable of repetition but likely to evade review if the general rule on mootness is applied. *Stottlemyer v. Stottlemyer*, 458 Pa. 503, 329 A.2d 892 (1974); *Wiest v. Mount Lebanon School District*, 457 Pa. 166, 320 A.2d 362 (1974), *cert. denied*, 419 U.S. 967, 95 S.Ct. 231, 42 L.Ed.2d 183 (1974); *Commonwealth v. Joint Bargaining Committee, supra*, 484 Pa. at 175, 398 A.2d at 1001; *Sherrer v. Lamb*, 319 Pa.Super. 290, 466 A.2d 163 (1983). Thus a case will not be found moot when the challenged action is in its duration too short to permit full litigation and there is a reasonable expectation that the same complaining party will be subject to the same action again, *Commonwealth v. Roger Buehl, Appeal of Philadelphia Newspapers, Inc.*, 316 Pa.Super. 215, 462 A.2d 1316 (1983), citing *Weinstein v. Bradford*, 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975), or, in a class action, when there is a "constant existence of a class of persons suffering the deprivation," *Sherrer v. Lamb, supra*, 319 Pa.Super. at 295, 466 A.2d at 166, citing *Gerstein v. Pugh*, 420 U.S. 103, 111, 95 S.Ct. 854, 861, 43 L.Ed.2d 54 (1975). Where the same party will not be subject to the harm again and the action is not a class action, still, the case will not be found moot if the issues capable of repetition but likely to evade review are "substantial questions," or "questions of public importance." *Colonial Gardens Nursing Home, Inc. v. Bachman*, 473 Pa. 56, 373 A.2d 748 (1977); *Janet D. v. Carros*, 240 Pa.Super. 291, 362 A.2d 1060 (1976); *Goldsmith v. Lower*

*Moreland School District,* 75 Pa.Cmwlth. 288, 461 A.2d 1341 (1983); *accord In re Remley,* 324 Pa.Super. 163, 471 A.2d 514 (1984).[2]

■ Here we may assume that the particular patient, appellants' son, is not reasonably likely to suffer another emergency involving surgery incident to which he is subjected to a transfusion by court order. However, there is a large class of other Jehovah's Witnesses, and it *is* reasonably likely that at least some of these will be involved in emergencies in which a doctor will seek a court order authorizing a transfusion. Moreover, the issues raised by this case are capable of evading review if the general rule of mootness is applied, for a transfusion ordered by a court in an emergency will always be given before the appellate process can be completed. Finally, the rights alleged to have been violated include the First Amendment right to freedom of religion, a matter of public importance.[3] We therefore conclude that this case is not moot.[4]

2. Another factor that may be important in deciding whether a case is moot is the existence of a full record. *Janet D. v. Carros, supra,* 240 Pa.Super. at 291, 362 A.2d at 1060. Here, however, this factor is not important. Briefs have been submitted by both parties, and by the Hospital Association of Pennsylvania as *amicus curiae.* The hearing conducted by the trial court was short, but that was because the court viewed the situation as an emergency in which the need for the order was immediate. Slip op. of tr. ct. at 9. The issue before us is the obligation of the court in precisely such an emergency situation. We therefore do not anticipate that in another case like this one the record will be any fuller.

3. The same constitutional right was alleged to have been violated in *Wiest v. Mount Lebanon School District, supra.* In that case the plaintiffs were members of a high school graduating class who sought to enjoin inclusion of an invocation in their graduation ceremony as violative of the First Amendment. While the court did not specifically discuss the public importance of the issue, it found the case not moot because the issue was capable of repetition but likely to evade review. At the time of the appeal the graduation ceremony was over and the plaintiffs, having graduated, could not be subject to the same harm again. 457 Pa. at 166, 320 A.2d at 362.

 As we have noted, appellants also allege that their son's "right to self-determination" was violated. We think it unnecessary to consider to what extent this might differ from his right to freedom of religion.

4. The Supreme Court of New Jersey has reasoned similarly in *John F. Kennedy Memorial Hospital v. Heston,* 58 N.J. 576, 279 A.2d 670

Our Supreme Court's decision in *In re Gross, supra,* is not to the contrary. There the Court held that the appeal of an order denying an injunction to halt administration of medication against the patient's will was moot after the patient was released. The case is distinguishable because the law under which the medication was administered, and which the appellant was challenging as unconstitutional, had been amended before the appeal was heard. *Id.,* 476 Pa. at 203, 382 A.2d at 116.[5]

2

On the merits of this case, the issue presented is narrow. Specifically, it is: was the evidence that the patient would refuse a blood transfusion of such quality that the court should not have appointed a temporary guardian to consent to a transfusion being given? Obviously, this is not an abstract question; it can only be answered in the context of the particular facts of the situation that confronted the

(1971). There the Court heard the appeal of an order appointing a guardian to consent to blood transfusions necessary to save the life of an unconscious Jehovah's Witness, even though the transfusions had already been given. As here, it was alleged that the order violated First Amendment rights. The New Jersey Supreme Court said:

The controversy is moot. [The former patient] is well and no longer in plaintiff hospital. The prospect of her return at some future day in like circumstances is too remote to warrant a declaratory judgment as between the parties. Nonetheless, the public interest warrants a resolution of the cause, and for that reason we accept the issue.

*Id.* at 579, 279 A.2d at 671.

5. *Hamilton v. McAuliffe,* 277 Md. 336, 353 A.2d 634 (1976), cited by appellee at 15–17 of its brief, is also not to the contrary. In that case plaintiff sought a declaratory judgment that a court order authorizing a blood transfusion against his wishes violated his constitutional rights. The order had not been appealed to the highest court of the state. Even though the Court of Appeals found the issue moot, it specifically distinguished the situation where the judicial review of the original order was sought on appeal, and cited *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and *John F. Kennedy Hospital v. Heston, supra,* 58 N.J. at 576, 279 A.2d at 670, in support of the distinction. *Id.,* 277 Md. at 341 n. 3, 353 A.2d at 637 n. 3.

court. We must therefore start our discussion by stating what those facts were.[6]

On July 30, 1984, the patient was injured in an automobile accident in New Jersey. Surgery was performed, but he lapsed into a coma and was transported by helicopter to appellee, the Lehigh Valley Hospital Center, a regional trauma center, arriving there on August 1. Slip op. of tr. ct. at 3.

On August 1, counsel for appellee orally petitioned the trial court for authority to administer a blood transfusion to the patient. A brief ex parte hearing was conducted by telephone. The court heard testimony by the patient's attending surgeon and the assistant hospital administrator, the testimony being transcribed by an official court reporter who was listening on an extension. Slip op. of tr. ct. at 2. The doctor testified that the patient had "an acute subdural hematoma" and that "without surgery, death [was] imminent." N.T. 8/1/84, 2. The doctor further testified that the patient was in the operating room awaiting surgery, and that while it might "be possible to do the surgery without a blood transfusion," "very rapid" and "severe" bleeding might result that "would require transfusion in order to save his life." *Id.*, 2–3. The assistant hospital administrator testified as to the patient's name and age, which he believed to be 22 years. *Id.*, 5. The trial court "found that the patient would die if surgery were not immediately performed". Slip op. of tr. ct. at 2. The court "also found that [the patient] would die without a blood transfusion if complications developed during the operation". *Id.* (footnote omitted). The court entered an order appointing the hospital administrator "temporary guardian to consent to blood transfusions to be administered to [the patient] in connection with surgery being performed by [the doctor at the hospital]". Order of 8/1/84. Immediately after the hearing, surgery was performed. The temporary guardian

6. Appellee has moved to strike appellants' brief and reproduced record on the ground that they include exhibits not of record. We deny the motion, but we note that appellants' action was improper, and, as will be apparent from the discussion that follows, we have confined ourselves to the facts of record.

was present during the surgery, and consented to a transfusion. Slip op. of tr. ct. at 4.

On August 3, on oral petition by counsel for appellee, a second ex parte hearing was conducted by telephone, the testimony again being transcribed by an official court reporter who was listening on an extension. The attending surgeon testified that the patient had developed a blood clot in the brain and that he believed that the clot should be surgically removed immediately because the patient was "in danger of sinking further into a coma of irreversible massive brain damage" and was "in danger of death from that." N.T. 8/3/84, 6. The doctor further testified that the patient's blood count was already "dangerously low", and that if no transfusion could be administered during the surgery the patient "could die from the hemorrhage [that might result]". Id., 5–6. Finally, the doctor testified that he had spoken with the patient's father, mother, and fiancee, and also his minister, and that while the father had signed forms consenting to the surgery—both the surgery that had been performed on August 1st and the surgery that the doctors believed should be performed on August 3rd—they had not consented to a blood transfusion because they were Jehovah's Witnesses. Id., 6–7. The assistant hospital administrator testified, indicating his willingness again to serve as the patient's temporary guardian, id., 9, and the court thereupon entered an order appointing him "temporary guardian to consent to blood transfusions to be administered" in connection with the surgery and the patient's recovery. Order of 8/3/84.

After the doctor and temporary guardian had departed for the operating room, the court received word that an attorney was telephoning from his law office in Philadelphia. The attorney was "patched into the conference call ... and then verbally entered his appearance for [the patient]". Slip op. of tr. ct. at 8 n. 21. A rather extended colloquy between the court, the attorney, and counsel for appellee ensued. The court summarized what had occurred before the attorney's call; concluding by saying that it was

about "to dictate on the record an order formalizing" its verbal appointment of the temporary guardian. N.T. 8/3/84, 13. The court then invited the attorney to make such statement as he wished. *Id.* In the ensuing statement the attorney said that he assumed that when the patient was injured, he was carrying a medical alert card. *Id.*, 14–15. He explained that as a member of Jehovah's Witnesses he himself carried such a card. *Id.* The court responded that at the August 1st hearing it had been advised that the patient had been carrying "some kind of card identifying him as a Jehovah's Witness and indicating something about blood transfusions", but that the court had not seen the card because it apparently had been left in New Jersey with the patient's personal effects when the patient was transported by helicopter to appellee hospital. *Id.* 14–17. With the court's permission, the attorney read from his card. He said that his card included the statements: "I direct that no blood transfusions be administered to me even though others deem such necessary to preserve my life or health". "This is in accord with my rights as a patient and my beliefs as one of Jehovah's Witnesses." "I hereby release the doctors and the hospital of any liability for damages attributed to my refusal. This document is valid, even if I am unconscious, and it is binding upon my heirs or legal representatives." And, "The Bible commands: Keep abstaining from blood". The attorney further described his card as providing a place for the bearer's signature. *Id.*, 16–18.

As we have noted at the outset of this opinion, appellants argue that they should have been appointed temporary guardians, and that in appointing the hospital administrator temporary guardian to consent to blood transfusions, the trial court infringed their son's, the patient's, right to self-determination and his First Amendment right to freedom of religion. In support of this argument, appellants cite cases in which courts have allowed *competent*

Jehovah's Witnesses to refuse blood transfusions.[7] Appellants reason from these cases that the trial court should have applied the doctrine of substituted judgment, under which a court will try to determine what an *incompetent* patient would have done had the patient been able to make a decision. Had the trial court applied this doctrine, appellants maintain, it should have found from the evidence of the patient's possession of a medical alert card, his standing as a Jehovah's Witness, and the refusal of appellants as his parents to consent to a transfusion, that the patient would himself have refused a transfusion. Brief of Appellants at 31.

We know of no Pennsylvania appellate decision applying the doctrine of substituted judgment to allow refusal of medical treatment in any circumstances, and appellants have cited none. Moreover, where the doctrine has been followed, it has typically been applied to allow refusal of life-preserving treatment on behalf of an incompetent who is terminally ill or has a limited life expectancy, *Superintendant of Belchertown State School v. Saikewicz,* 373 Mass. 728, 370 N.E.2d 417 (1977); *Matter of Conroy,* 98 N.J. 321, 486 A.2d 1209 (1985); *In re Quinlan,* 70 N.J. 10, 355 A.2d 647 (1976); *Matter of Storar,* 52 N.Y.2d 363, 438 N.Y.S.2d 266, 420 N.E.2d 64 (1981), or where the treatment is not contemplated in a life-threatening situation, *In re Boyd,* 403 A.2d 744 (D.C.1979). Appellants have cited no case in which the doctrine has been applied as they urge it should be here: to refuse, in an emergency and against the treating physician's advice, to provide life-preserving treat-

7. It should be added, however, that even in cases involving competent patients whose refusal is based on religious grounds, the right to refuse treatment is not absolute. Instead, where courts have found the refusal of treatment valid, they have balanced the patient's right to refuse treatment against compelling state interests. *Holmes v. Silver Cross Hospital,* 340 F.Supp. 125 (N.D.Ill.1972); *In re Osborne,* 294 A.2d 372 (D.C.1972); *John F. Kennedy Memorial Hospital, supra,* 58 N.J. at 576, 279 A.2d at 670. Among such state interests that the courts have considered in this balancing test are the state's interests in preserving life, in preventing suicide, in protecting dependent third parties, and in preserving the ethical integrity and standards of treatment of the medical profession. *Satz v. Perlmutter,* 362 So.2d 160 (Fla.1978).

ment to a young adult who, if the treatment is successful, will return to competency, with a full life expectancy.

The Court of Appeals for the District of Columbia has cautioned against application of the doctrine of substituted judgment in such circumstances. In *In re Osborne*, 294 A.2d 372 (D.C.1972) the court said:

> Whenever possible it is better for the judge to make a first-hand appraisal of the patient's personal desires and ability for rational choice. In this way the court can always know, to the extent possible, that the judgment is that of the individual concerned and not that of those who believe, however well-intentioned, that they speak for the person whose life is in the balance. Thus, where the patient is comatose, or suffering impairment of capacity for choice, it may be better to give weight to the known instinct for survival which can, in a critical situation, alter previously held convictions. In such cases it cannot be determined with certainty that a deliberate and intelligent choice has been made.

Id. at 374–75.

The approach taken by the Supreme Court of New Jersey in its recent decision in *Matter of Conroy, supra,* is also instructive. That case concerned a petition by the guardian of an incompetent, terminally ill nursing home patient, seeking permission to remove her feeding tube. In discussing how to determine what the patient would have done if able to choose for herself, the Supreme Court said that it could consider a broad array of evidence, including written documents, oral directives to family members, friends, or health care providers, durable powers of attorney, reactions the patient had expressed regarding medical treatment administered to others, the patient's consistent pattern of conduct respecting decisions about his own medical care, and the tenets of the patient's religious belief. 98 N.J. at 361–62, 486 A.2d at 1229–30. Particularly pertinent to the issue before us is the care the court contemplated being taken to assess the probative value of such evidence; the court said that the evidence should be evaluated according

to the remoteness, consistency and thoughtfulness of the patient's prior statements or actions, and according to the patient's maturity at the time of the statements or actions. The court also said that the length of time the patient had held the views in question should be considered, as well as whether the patient had acted on them before. *Id.* at 362–63, 486 A.2d at 1230. *Cf. Matter of Storar, supra,* 52 N.Y.2d at 379, 438 N.Y.S.2d at 273, 420 N.E.2d at 72 (proof that person now incompetent left instructions to terminate life sustaining procedures when there was no hope of recovery must be by clear and convincing evidence).

In the present case, involving a young person whose refusal of treatment would be both contrary to medical advice and life-threatening, the need for caution was particularly acute. While a medical alert card would be some evidence of what the patient would do if competent, it could not by itself support an application of the doctrine of substituted judgment. The court would still have to inquire into and consider factors such as how recently the card had been executed and the circumstances surrounding its execution. The court would need evidence on whether the patient had signed the card as an affirmation of faith and statement of unity with other members of his congregation, or whether he had really contemplated it as binding in a death-threatening situation. The court would also have to consider whether circumstances had intervened since the card had been signed that cast doubt on whether it still expressed the patient's firm and final decision.

The trial court, however, was in no position to conduct such an inquiry. The patient was in danger of death every moment surgery was delayed. The medical alert card carried by the patient was not before the court. The court did not know the circumstances under which the patient had signed the card, or even whether he had in fact signed it. Slip op. of tr. ct. at 7 n. 19. No witnesses were present to testify regarding the firmness of the patient's beliefs. While the court knew that the patient's parents were at the hospital, its knowledge that they were committed to the

tenets of Jehovah's Witnesses justified the conclusion that their testimony alone would be inadequate to support a finding that the patient's faith would not waver, even in the face of death.

 The trial court states in its opinion, slip op. of tr. ct. at 16, that given the situation confronting it, it adopted the approach of United States Court of Appeals Judge J. Skelly WRIGHT, who, in similar circumstances, wrote:

> The final, and compelling, reason for granting the emergency writ was that a life hung in the balance. There was no time for research and reflection. Death could have mooted the cause in a matter of minutes, if action were not taken to preserve the *status quo.* To refuse to act, only to find later that the law required action, was a risk I was unwilling to accept. I determined to act on the side of life.

> *Application of the President and Directors of Georgetown College, Inc.,* 331 F.2d 1000, 1009–10 (D.C.Cir.1964).

We agree with the trial court's determination, and hold that the orders appointing the hospital administrator temporary guardian to consent to blood transfusions were properly issued.[8]

 Appellants' argument that as the patient's parents they should have been appointed guardians is without merit. Section 5513 of the Probate, Estates and Fiduciaries Code, under which the trial court issued its orders, provides

---

8. JUDGE BECK is entirely correct in saying, in her dissent, that this opinion should be read narrowly. While we disagree with her view that the trial court should be reversed for not speaking with the patient's parents and fiancée, we emphasize that this is because in the circumstances of this case the patient's need for surgery was immediate; the parents had already demonstrated their own view by informing the surgeon that they would not consent to a transfusion; and the trial court simply did not have enough time to gather sufficient evidence, either in terms of quantity or quality, to warrant a finding that the patient would have refused blood transfusions if competent. Our decision today does not reach situations in which the trial court may delay its decision without risk of death or other grave and irreversible consequences to the patient, or situations where clear and convincing evidence of what the patient would do if competent is immediately available to the court.

that "notice of the petition and hearing shall be required as shall appear to the court to be feasible in the circumstances." 20 P.S. § 5513. In the emergency situation governing the granting of these orders, the court acted within its discretion in not requiring notice to, and testimony by, appellants. The doctor testified that appellant father had consented to the surgery, and that appellants "were aware of the risks of surgery [but refused to consent to a blood transfusion]", and "were aware that we would seek a Court Order [authorizing a transfusion]." N.T. 8/3/84, 6–7. It is evident that had the court required formal notice to appellants and heard their testimony, the result would not have been different; as we have discussed, testimony confirming appellants' opposition to a transfusion would not have been sufficient to warrant application of the doctrine of substituted judgment. Moreover, for the trial court to have appointed appellants temporary guardians would have been self-defeating: the court knew that as guardians the parents would refuse to given the consent necessary to achieve what the court had properly found was necessary to save the patient's life. When the appointment of a guardian is within the discretion of the court, as it was here, the court should not select as a guardian someone who has, or may have, an interest adverse to that of the incompetent. *In re Voshake's Guardianship*, 125 Pa.Super. 98, 189 A. 753 (1937).

The orders of the trial court are affirmed.

BECK, J. files a dissenting opinion.

BECK, Judge, dissenting:

I dissent.

The majority sensibly frames the issue narrowly: whether the evidence was of "such quality" that it was proper for the court to appoint a temporary guardian to consent to a blood transfusion for an adult Jehovah's Witness member.

Unlike the majority, I would conclude that at the point that the trial court appointed the assistant hospital administrator as guardian, the court did not have evidence of "such quality" that its action should be affirmed. Other relevant evidence was available to the court and necessary for its determination.

I agree with the majority that the existence of the medical alert card alone would not support an application of the doctrine of substituted judgment. The trial court, however, did not request or hear the testimony of the patient's parents or his fiancee, who were present in the hospital. Even in this emergency situation, the judge had readily available, by telephone, witnesses who were prepared to testify as to, among other things: whether the patient signed the medical alert card and, if he did, under what circumstances; whether the patient was an adult; and whether the patient's beliefs were firm and whether he would have adhered to them if death was certain. The trial court should have heard this testimony.

It may well be that, in this particular case, even after hearing such testimony the trial judge would have been justified in concluding that the patient's intent had not been sufficiently proven. The court could then have properly appointed the assistant hospital administrator as temporary guardian to consent to blood transfusions.

The majority excuses the trial court's failure to hear the available testimony on the ground of "its (the court's) knowledge that they (the parents) were committed to the tenets of Jehovah's Witness." Maj. op. at 73–74. In an action of this nature a court cannot refuse necessary testimony because it concludes on its own in advance what that testimony will be. I do not deny the urgency of the situation faced by the trial judge in this case. The parents' and the fiancee's testimony, however, was available to the judge on the same emergency basis as the doctor's and the assistant hospital administrator's, and such testimony was

essential to the judge before he decided to appoint the assistant hospital administrator as guardian.

The majority cites *In re Osborne*, 294 A.2d 372, 374–75 (D.C.1972), for the proposition that substituted judgment should be applied reluctantly and that "it is better ... to make a first-hand appraisal of the patient's personal desires and ability for rational choice." *Id.* I would agree that a competent patient's first-hand expression of his or her desires is the best guidepost for a court. The portion of *Osborne* quoted by the majority goes on, however, to conclude that, in the absence of the possibility of asking the patient, a court should "give weight to the known instinct for survival." Maj. op. at 72. Such a statement comes very close to stating a compelling state interest in always sustaining life in any situation.

I am very concerned that by quoting with approval the above passage and by affirming the trial court's action in spite of its failure to take available testimony, the majority's opinion will be read more broadly than intended. I do not view the holding in this case as requiring courts in the future to approve life-preserving treatment to incompetent adults in a broad variety of emergency situations in the face of available evidence of the patient's intent to the contrary. I would therefore emphasize the narrowness of the holding in this case. The state's interest in preserving life must give way to the patient's much stronger personal interest in directing the course of his own life. *Matter of Conroy*, 98 N.J. 321, 348, 486 A.2d 1209, 1223 (1985). Competent persons generally are permitted to refuse medical treatment, even at the risk of death. *Id.*, at 352, 486 A.2d at 1225. I would hold that the same should be true of incompetent persons, if it can be determined that their desires as expressed when competent would continue to constitute their present intent. *See In re Osborne, supra*, 294 A.2d at 375 n. 5 (rejecting view that the state must have a compelling interest in sustaining life).

Since the trial court refused to hear essential testimony, in a proper case, I would have reversed.