**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: N.S. | : | IN THE SUPERIOR COURT |
| | : | OF PENNSYLVANIA |
| | : | |
| Appellant | : | No. 597 MDA 2020 |

Appeal from the Order Entered March 5, 2020
in the Court of Common Pleas of Centre County
Civil Division at No: 2020-656

BEFORE:    STABILE, J., NICHOLS, J., and STRASSBURGER, J.*

MEMORANDUM BY STABILE, J.:                    **FILED: JULY 14, 2021**

Appellant, N.S., appeals from an order directing him to undergo continuing involuntary inpatient mental health treatment under 50 P.S. § 7303 ("section 303") of the Mental Health Procedures Act ("MHPA").  Upon review, we affirm.

This case stems from N.S.'s involuntary commitment to the care of Mt. Nittany Medical Center ("MNMC") on February 22, 2020.  On that date, N.S. arrived at the emergency department at MNMC shortly before midnight.  An emergency department provider at MNMC completed an application for involuntary emergency examination and treatment pursuant to 50 P.S. § 7302 ("section 302") of the MHPA.  The application stated that prior to his arrival in the emergency department, N.S.'s friend contacted a crisis service, which referred him to the MNMC emergency department.  According to the application, N.S.'s friend reported that on February 21, 2020, N.S. was "acting very erratic" in downtown State College, Pennsylvania, and was "not making sense when talking, manic, and handing out thousands of dollars to random

_____

* Retired Senior Judge assigned to the Superior Court.

people." Section 302 Application, 2/22/20, at 3 (pagination supplied). The application further stated that while in the emergency department, N.S. was "laughing inappropriately the entire time, responding to internal stimuli" and had "pressured speech, [] flight of ideas[,] and difficulty maintaining focus." *Id.* at 3–4 (pagination supplied). After N.S. reported he had been diagnosed with bipolar disorder, schizophrenia, and major depressive disorder ("MDD"), he added "also, Alzheimer's, dementia, and Parkinson's. Nevermind, that's a lie."[1] *Id.* at 4 (pagination supplied and internal quotation marks omitted). N.S. indicated that he had stopped taking a psychiatric medication on his own, but he did not remember when or why. *Id.* When asked if he had any legal issues, N.S. responded "I steal books from Websters. Now I owe Elaine an IOU." *Id.* N.S. did not know whether he had been sleeping or eating and "continued to make nonsensical comments throughout the entire assessment." *Id.* Finally, the application stated that N.S. did "not show competency to sign in voluntarily." *Id.* A physician then examined N.S. and reported findings of "delusions, flight of ideas, poor reality testing, poor insight, [and] poor judgment." *Id.* at 8 (pagination supplied). Based on the foregoing, N.S. was involuntarily admitted on February 22, 2020, for psychiatric examination and treatment for a period not to exceed 120 hours under section 302. *Id.*

---

[1] At the time, N.S. was 29 years old.

On February 24, 2020, MNMC filed in the trial court an application for extended involuntary treatment of N.S. for a period of 20 days under section 303. After examining N.S., Melissa Pell, M.D., a psychiatrist at MNMC, indicated in her findings that N.S.

> is diagnosed with bipolar disorder type I, current episode manic with psychosis, and is hospitalized for florid manic and psychotic symptoms, including lack of sleep, hyperactivity, erratic behavior, pressure and excessive speech, labile and expansive mood, hypersexual behavior, and hallucinations. He is disorganized, with flight of ideas, inappropriate laughter, and has been harassing and physically touching female staff inappropriately. He lacks insight into his condition, and has not been on medication or in outpatient treatment despite previous hospitalization "for the same thing[,]" according to [N.S]. He lives alone, recently dropped out of graduate school at [Pennsylvania State University (PSU)], has few local supports, no health insurance, and no outpatient care."

Section 303 Application, 2/24/20, at 3–4. Dr. Pell indicated that N.S. needed "[c]ontinued inpatient treatment, adjustment of medications, involvement in groups and therapy once he is able to tolerate them, and discharge planning." *Id.* at 3. In Dr. Pell's opinion, N.S. continued "to be severely mentally disabled and in need of involuntary inpatient, outpatient or partial hospitalization treatment or a combination under Section 301(b)(1) or (2)." *Id.* at 4.

On February 25, 2020, a hearing was held at MNMC to determine whether N.S.'s involuntary commitment should be extended under section 303. N.S., the Centre County Public Defender's Office, on behalf of N.S., and Mary Ann Kresen, Esquire, on behalf of MNMC, appeared before a Mental Health Review Officer ("MHRO"). MNMC presented the testimony of Dr. Pell

as an expert in the field of psychiatry. N.T., 2/25/20, at 6. As N.S.'s treating physician, Dr. Pell testified to her findings as stated in the Section 303 Application. *Id.* at 8–17. In Dr. Pell's opinion, N.S. was not "able to provide for his own basic needs, including health, safety, welfare, and nutrition, without the care and assistance he's receiving" with inpatient treatment. *Id.* at 8. According to Dr. Pell, the "primary concern" was "due to the severity of the manic and psychotic symptoms" that N.S. had displayed. *Id.* at 8–9. She explained that N.S.

> had very poor boundaries and behavioral control, which led to harassment of female staff and peers and even inappropriate touching of female staff here in the hospital and inability to recognize that as inappropriate. Prior to coming in, as detailed in the 302 petition, he was behaving very erratically in the community. A friend was concerned, having never seen him behave this way before, and brought him in. And our concern is that, that behavior would continue.
>
> The reasons that we're concerned it would continue, if he were discharged at this time, is because he tells me he doesn't think he has a mental illness and doesn't think he needs treatment. He doesn't have any outpatient treatment providers. He has not been willing to allow us to refer him for outpatient treatment. He has not been willing to let us get information from past episodes of treatment, which were not in this community, but were in another state. And he has few supports here, no family here. Only recently came to the area. Was a Penn State student, but has dropped out and does not have a plan for when he leaves. Other than he tells me to clean his room, and then to try to get into a graduate program at another university somewhere else.

*Id.* at 9–10. Dr. Pell opined that there was a reasonable probability that N.S.'s untreated behavior would lead to death, disability, or serious physical debilitation within 30 days. *Id.* at 10. Dr. Pell testified that she considered

N.S. to be a danger to himself and others. *Id.* at 14. She testified that her concern was "the hypersexuality and the inappropriate touching of females, that that could — that would certainly put females around him at risk and could also put him at risk, especially if he's behaving in that way, not recognizing that it's inappropriate and somebody is retaliating against him in some manner." *Id.* at 10–11. Dr. Pell was concerned that "somebody would retaliate against [N.S.], because of his behavior and inability to recognize it as inappropriate." *Id.* at 15. She added that "there's been multiple complaints from multiple females on the unit about harassment and even touching them inappropriately." *Id.* Dr. Pell believed that such behavior would continue without treatment. *Id.* at 11.

N.S. had only just begun taking medication upon admission, and Dr. Pell testified that N.S. did not think he needed medication, was taking it reluctantly, and would not continue taking it if not hospitalized. *Id.* at 11–12. According to Dr. Pell, it would take longer, *i.e.*, 10–20 days, to treat N.S. with appropriate medication and titrate the dose due to an inability to obtain information relating to N.S.'s past medical history and the level of N.S.'s willingness to cooperate with treatment and assessments. *Id.* at 12, 14. According to Dr. Pell, N.S.'s condition had improved since he had been admitted, he was "sleeping much better," he was not trying to harm himself, and she believed more improvement would occur if N.S. received inpatient treatment. *Id.* at 13, 15, 17. Dr. Pell confirmed the treatment would be as

she indicated in the Section 303 Application, and opined that inpatient treatment was "the least restrictive environment for [N.S.] to receive the necessary and appropriate treatment." *Id.* at 13–14.

That same date, the MHRO filed her report, wherein she recommended the trial court find N.S. severely mentally disabled, in need of involuntary treatment within the meaning of the MHPA, and be committed to inpatient treatment at MNMC for a period not to exceed 20 days. Report of Mental Health Review Officer, 2/25/20, at 3 (pagination supplied).

On February 27, 2020, the trial court entered an order stating it was satisfied by clear and convincing evidence of N.S.'s need for inpatient treatment under section 303, as determined by the MHRO, and ordered N.S. to be committed involuntarily for inpatient treatment not to exceed 20 days. Order, 2/27/20. On March 2, 2020, N.S. filed a petition seeking review of his commitment under section 303, averring that MNMC "failed to present clear and convincing evidence of a reasonable probability that N.S. would suffer death, serious bodily injury, or serious physical debilitation within 30 days in the absence of inpatient treatment." Post-Trial Motion/Petition for Review of Certification for Extended Involuntary Emergency Treatment, 3/2/20, at ¶ 6.

On March 5, 2020, N.S., his counsel, and counsel for the office of the Centre County Mental Health/Intellectual Disabilities ("Centre County MH/ID") appeared before the trial court for a hearing. By this point, N.S. already had been discharged from MNMC a few days earlier on March 2, 2020. N.T.,

3/5/20, at 7. N.S. testified on his own behalf, and Centre County MH/ID relied on the testimony of Dr. Pell from the February 25, 2020 hearing. N.S. stated that he had moved to the area about eight months prior to attend a Ph.D. program at PSU, had withdrawn from the program, was awaiting admission decisions from other Ph.D. programs, worked at a local calzone business, and was volunteering at three local charitable organizations. *Id.* at 4-6. He had family friends in the area and while his parents were out of state, he was in "constant communication" with them. *Id.* at 6.

N.S. denied any self-harm ever and denied being unable to answer questions during intake at MNMC. *Id.* at 8–9, 12–13. When asked about "handing out money to random people," N.S. denied that it was random and said it was intentional. *Id.* at 10–11, 15. According to N.S., he had closed his bank account, withdrawn $3,500.00, and made charitable donations to the organizations where he volunteered and to his friends who volunteered there. *Id.* at 11. He also used his money to buy his friends drinks at a bar the night he was taken to MNMC; he denied drinking that night. *Id.* at 16.

When asked about the harassment of staff at MNMC, N.S. testified that he thought he was being friendly, he may have been overly friendly, and he believed it was "consensual flirtation." *Id.* at 8. He stated his behavior resulted from both his "natural personality," which he described as outgoing, enthusiastic, energetic, personable, and overly friendly, as well as from the "culture shock" of confusion and fright he was experiencing from being

committed. *Id.* 7–8. He denied groping, hugging, or "high-fiving" staff. *Id.* at 12. According to N.S., he first learned his behavior was problematic from Dr. Pell's testimony at the section 303 hearing, he apologized immediately thereafter, and the staff then taught him to "fist bump" instead. *Id.* at 8, 12. N.S. said no criminal charges were filed and he was not aware of any complaints filed against him relating to his behavior. *Id.* at 8.

N.S. stated that he was discharged less than a week after the section 303 commitment and was not having trouble showering, eating, and sleeping since his discharge. *Id.* at 7–9. N.S. testified that he was taking his medications as prescribed, denied that he had stopped taking them when he was first brought to MNMC, and stated he had made appointments for follow-up care after discharge. *Id.* at 9, 13–14.

That same date, the trial court denied N.S.'s petition for review and reaffirmed the February 27, 2020 commitment order. Appellant filed a timely appeal, and both N.S. and the court complied with Pa.R.A.P. 1925.

N.S. raises one question in this appeal:

Whether the state lacked sufficient evidence to justify a commitment under the [MHPA] as it failed to present clear and convincing evidence of conduct supporting a conclusion that death or serious physical debilitation or bodily injury were likely imminent if he were not forced into treatment?

N.S.'s Brief at 4.[2]

---

[2] Although N.S.'s commitment order has expired, his appeal is not moot.
*(Footnote Continued Next Page)*

The standard of review for an involuntary commitment order under the MHPA is to "determine whether there is evidence in the record to justify the court's findings." ***In re S.M.***, 176 A.3d 927, 935 (Pa. Super. 2017), *quoting* ***In re T.T.***, 875 A.2d 1123, 1126 (Pa. Super. 2005) (citation omitted). "Although we must accept the trial court's findings of fact that have support in the record, we are not bound by its legal conclusions from those facts." ***Id.***

We have explained the involuntary commitment process under the MHPA as follows.

> The MHPA provides for involuntary emergency examination and treatment of persons who are "severally mentally disabled and in need of immediate treatment." 50 P.S. § 7301(a). It then authorizes increasingly long periods of commitment for such persons, balanced by increasing due process protections in recognition of the significant deprivations of liberty at stake. ***See In re A.J.N.***, 144 A.3d 130, 137 (Pa. Super. 2016) (highlighting MHPA's purpose as "an enlightened legislative endeavor to strike a balance between the state's valid interest in imposing and providing mental health treatment and the individual patient's rights") (quoting ***In re Hutchinson***, [] 454 A.2d 1008, 1010 ([Pa.] 1982)); ***In re Ryan***, 784 A.2d 803, 807 (Pa. Super. 2001)

---

We recognize that an important liberty interest is at stake in all involuntary commitments and by their nature, most commitment orders expire prior to appellate review. Since a finding of mootness would allow such claims to go unchallenged in most, if not all, cases, we continue to hear these matters and, where the facts allow, we have authority to vacate a commitment order and direct that the record be expunged.

***In re R.D.***, 739 A.2d 548, 553 (Pa. Super. 1999) (citations omitted); ***see also In re J.M.***, 726 A.2d 1041, 1045 n.6 (Pa. 1999) (holding appeals from expired involuntary commitment orders were not moot as the issues raised on appeal were capable of repetition and may evade review). Accordingly, the appeal is properly before us.

("The legislative policy reflected in the [MHPA] is to require that strict conditions be satisfied before a court order for commitment shall be issued. Such a policy is in accord with the recognition that commitment entails a massive deprivation of liberty.") (quoting **Commonwealth v. Hubert**, [] 430 A.2d 1160, 1162 ([Pa.] 1981)). Accordingly, "[i]n applying the [MHPA,] we must take a balanced approach and remain mindful of the patient's due process and liberty interests, while at the same time permitting the mental health system to provide proper treatment to those involuntarily committed to its care." **In re S.L.W.**, 698 A.2d 90, 94 (Pa. Super. 1997).

**In re S.M.**, 176 A.3d at 930–31.

Under subsection 301(a) of the MHPA:

Whenever a person is severely mentally disabled and in need of immediate treatment, he may be made subject to involuntary emergency examination and treatment. A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself, as defined in subsection (b), or the person is determined to be in need of assisted outpatient treatment as defined in subsection (c).[3]

50 P.S. § 7301(a). Subsection 301(b)(2) defines "clear and present danger"

to oneself, in relevant part, as follows:

Clear and present danger to himself shall be shown by establishing that within the past 30 days:

(i) the person has acted in such manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that death, serious bodily

---

[3] Subsection (c), 50 P.S. § 7301(c), is not at issue in this case.

injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under this act[.]

50 P.S. § 7301(b)(2)(i).[4]  Section 302 provides for emergency examination and treatment of persons, which

may be undertaken at a treatment facility upon the certification of a physician stating the need for such examination; or upon a warrant issued by the county administrator authorizing such examination; or without a warrant upon application by a physician or other authorized person who has personally observed conduct showing the need for such examination.

50 P.S. § 7302(a).  Under subsection 302(b), a physician must examine the person "within two hours of arrival in order to determine if the person is severely mentally disabled within the meaning of [sub]section 301(b) and in need of immediate treatment."  50 P.S. § 7302(b) (internal footnote omitted).  If the physician so finds, then "treatment shall be begun immediately."  *Id.*  If not, then "the person shall be discharged and returned to such place as he may reasonably direct."  *Id.*  Section 302 allows a person to be committed up to 120 hours.  50 P.S. § 7302(d).

When a treatment "facility determines that the need for emergency treatment is likely to extend beyond 120 hours," or five days, section 303 provides that the facility may apply to extend the involuntary commitment for up to 20 days.  *Id.* § 7303(a), (h).  The facility files an application for

_____

[4] Subsections 301(b)(2)(ii)-(iii), 50 P.S. § 7301(b)(2)(ii)-(iii), are not at issue in this case.

extended commitment with the court of common pleas, which then appoints an attorney for the person unless it appears "that the person can afford, and desires to have, private representation." *Id.* § 7303(b). "Within 24 hours after the application is filed, an informal hearing shall be conducted by a judge or [MHRO]." *Id.*

If the judge or MHRO certifies that an extended section 303 commitment is appropriate, the committed person may "petition the court of common pleas for review of the certification." *Id.* § 7303(g). The trial court must hold a hearing "within 72 hours after the petition is filed unless a continuance is requested by the person's counsel." *Id.* "The hearing shall include a review of the certification and such evidence as the court may receive or require." *Id.* "If the court determines that further involuntary treatment is necessary and that the procedures prescribed by the [MHPA] have been followed, it shall deny the petition. Otherwise, the person shall be discharged." *Id.*

The MHPA is to be strictly construed. *Commonwealth v. Moyer*, 595 A.2d 1177, 1179 (Pa. Super. 1991) (citation omitted). We have explained the following.

> Recognizing the substantial curtailment of liberty inherent to an involuntary commitment, our Supreme Court has cautioned that the courts must strictly interpret and adhere to the statutory requirements for commitment. [*Hubert,* 430 A.2d at 1162–63]. In interpreting [sub]section 301(b)(2)(i), this Court has held that a mere finding of senility is insufficient to establish that a person is a "clear and present danger" to himself. *See In re Remley*, [], 471 A.2d 514 ([Pa. Super.] 1984). Without evidence that the individual would die or suffer serious bodily injury or serious

- 12 -

physical debilitation in the immediate future unless he was committed, the statutory requirement had not been met. *Id.* at 517. Similarly, for involuntary commitment, it is not sufficient to find only that the person is in need of mental health services. ***Commonwealth v. Blaker***, [] 446 A.2d 976, 980 ([Pa. Super.] 1981). The court must also establish that there is a reasonable probability of death, serious injury or serious physical debilitation to order commitment. *Id.* at 979.

*In re T.T.*, 875 A.2d at 1126–27.

The issue in this case is whether there was sufficient evidence to warrant N.S.'s continued involuntary treatment under section 303. "The burden is on the petitioner to prove the requisite statutory grounds by clear and convincing evidence." ***In re S.M.***, 176 A.3d at 937 (citation and quotation marks omitted). "Our Supreme Court has defined clear and convincing evidence as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *Id.* (citations and internal quotation marks omitted). "[T]he clear and convincing evidence test has been described as an intermediate test, which is more exacting than a preponderance of the evidence test, but less exacting than proof beyond a reasonable doubt." ***In re S.T.S., Jr.***, 76 A.3d 24, 38 (Pa. Super. 2013) (citation and internal quotation marks omitted).

On appeal, N.S. argues "the evidence accepted at the mental health commitment hearing was insufficient to compel [N.S.] to undergo involuntary inpatient psychiatric treatment" and the "opinions regarding the potential for

imminent serious physical injury were speculative and unsupported by the evidence." N.S.'s Brief at 8–9. According to N.S., there was sufficient evidence that "his behaviors were erratic[,] annoying[,] and inappropriate[,]" but "even if that conduct constituted a criminal offense[,] it is too much of a stretch to conclude that death or serious bodily injury within the following 30 days would likely occur absent involuntary confinement for the express purpose of psychiatric treatment." *Id.* He claims Centre County MH/ID "offered only sheer speculation that these obnoxious behaviors would likely cause [N.S.] to kill or seriously injure another or that [N.S.'s] behaviors would likely cause an individual affronted by the obnoxious behaviors to kill or seriously injure [N.S.] in retaliation for the affront." *Id.* at 11.

N.S. relies on *Com. ex rel. Gibson v. DiGiacinto*, 439 A.2d 105 (Pa. 1981), to argue that N.S.'s involuntary commitment should be reversed. Gibson, who suffered from schizophrenia with paranoid delusions, pleaded guilty to various criminal charges and as part of his pre-sentence report, was ordered to undergo a psychiatric evaluation. After hearings under the MHPA, Gibson was involuntary committed for psychiatric treatment. At the court hearing, the examining psychiatrist opined that Gibson "posed a clear and present danger to himself and others," relying on evidence that Gibson was discovered extinguishing a burning newspaper in his prison cell, that Gibson failed to take scheduled doses of medication, and that a routine search at the jail revealed Gibson "possessed a twisted piece of coathanger." 439 A.2d at

106. Our Supreme Court reversed the involuntary commitment, explaining as follows.

> Clearly, the involuntary commitment of appellant was improper. There is no evidence of attempted suicide or self-mutilation. The burning newspaper in appellant's cell cannot be viewed as such an attempt. Appellant was permitted to smoke and other inmates had access to his cell. There was no evidence that the newspaper was deliberately set on fire. The testimony reveals only that appellant was extinguishing a folded newspaper that was one-quarter burned when he was confronted by the correction officer.
>
> Similarly, appellant's occasional failure to take medication did not threaten his life or well-being. There was no evidence to show that his behavior changed as a result of missed doses of the drug. Indeed, the only testimony offered indicated that the drug had long-lasting effectiveness and missing an occasional dose would not affect appellant's behavior. Appellant's possession of the piece of coathanger allegedly fashioned into a weapon was also not a proper basis for commitment. There was no testimony that appellant used or threatened to use the hanger to injure himself or others.
>
> Clearly none of the above instances constituted the overt act required by [the MHPA] nor do they show such inability on the part of appellant to attend to his needs as to threaten death, serious bodily injury, or serious physical debilitation. As there was insufficient evidence that appellant posed a clear and present danger to himself or others under the [MHPA], the hearing court erred in ordering appellant's involuntary commitment.

*Gibson*, 439 A.2d at 107 (footnote omitted). Thus, N.S. contends, if "finding an inmate's possession of a weapon, a first-degree misdemeanor …, was insufficient to involuntarily commit the torch wielding Gibson, the physical and verbal harassment attributed to N.S. has to have been insufficient as well." N.S.'s Brief at 12.

The trial court, on the other hand, analogized N.S.'s case to **In re T.T.** **See** Trial Court Opinion, 5/20/20, at 3. In **In re T.T.**, an inmate was involuntarily committed based on his contention that he was physically unable to walk despite no physiological explanation for his inability to walk. 875 A.2d at 1125. T.T. had refused to walk for two years and instead crawled in his prison cell. Physicians opined that T.T.'s psychiatric problems were interfering with his treatment for his non-ambulatory condition and would likely result in permanent disability unless he cooperated with physical therapy. **Id.** The evidence was uncontroverted that T.T. had not attempted self-mutilation or suicide, and he was not physically hostile or violent to others. **Id.** at 1127. Thus, "the only basis for involuntary commitment was a showing that [T.T.] was unable to care for himself and that there was a reasonable probability of his death, serious bodily injury or serious physical debilitation within thirty days unless commitment was ordered" under subsection 301(b)(2)(i). **Id.** This Court first rejected T.T.'s argument that he would not become permanently debilitated within the next 30 days, explaining that there was "no need to wait until this condition ha[d] progressed to the point that he is permanently unable to walk" and that the evidence was "clear that the debilitation will continue to escalate over the next thirty days." **Id.** at 1128. The Court went on to hold that the circumstances satisfied the statutory requirement of "serious physical debilitation" that would ensue within 30 days. **Id.**

The trial court found this case similar to *In re T.T.* in that "the basis for the twenty (20) day extension of the involuntary treatment here was a showing by the [MHRO] of [N.S.]'s **continued** inability to care for himself and a reasonable probability of serious bodily injury to himself or others unless commitment was ordered." Trial Court Opinion, 5/20/20, at 3 (emphasis in original). The trial court explained that "[o]f particular importance to the certification by the [trial c]ourt was [N.S.]'s refusal to take his medication, and his lack of insight or understanding regarding his diagnosis and need for treatment." *Id.* at 3–4. In its opinion, the trial court found it was "clear from the record and the testimony provided at the [section] 303 hearing [that N.S.]'s continuing condition require[d] inpatient treatment, [N.S.] [did] not recognize such, and continuing without said treatment and commitment support[ed] a reasonable probability that death or serious physical debilitation or bodily injury [would] result." *Id.* at 4. Further,

> if [N.S.] was not committed, he clearly would very likely continue to mismanage or refuse to take the medication necessary for mitigating his diagnoses and would continue to engage in inappropriate and dangerous conduct, as we have already been witness to. The [trial c]ourt believes it is important to note such conduct includes the harassment and inappropriate touching of female staff members, creating a reasonable probability of bodily injury to others. [N.S.]'s diagnosis and results of examination, particularly along with his refusal to cooperate in its management and his lack of insight or understanding regarding the same, is sufficient evidence of the necessity of continued treatment.

*Id.* at 5.

Our review of the record supports the trial court's conclusion that there was clear and convincing evidence of a "reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded" to N.S. under the MHPA. 50 P.S. § 701(b)(2)(i). Unlike the evidence presented in **Gibson**, which showed that Gibson's failure to take his medication did not cause changes in his behavior, here N.S. had significant changes to his behavior when he failed to take his medication. When N.S. stopped taking his prescribed medication[5] and presented at the hospital, his behavior was erratic; he was incoherent; he was unable to focus or answer questions; he had delusions, poor insight, and poor judgment; and he had pressured and excessive speech and flight of ideas, meaning he was talking very quickly and jumping rapidly from one idea to the next, making it difficult for others to follow him. With medication at the hospital, Dr. Pell testified that N.S.'s behavior improved. Further, Dr. Pell opined that N.S. was a danger to himself and others. She testified to the risk of harm to others and retaliation against N.S. based on his "very poor" boundary and behavior control, hypersexual behavior, physical and verbal

_____

[5] While N.S. disputed that he had stopped taking his medication, the trial court was free to believe all, some, or none of his testimony. "It is well-settled that a finder of fact is free to believe all, part or none of a witness' testimony." **J.C.B. v. Pennsylvania State Police**, 35 A.3d 792, 797 (Pa. Super. 2012) (stating "the trial court as the fact finder, acted within its discretion in failing to credit [J.C.B.'s] denial of suicidal ideations, including a suicide attempt, and discounting the testimony of [J.C.B.'s] psychiatric expert").

harassment of female staff, including inappropriate touching, and N.S.'s inability to recognize his behavior as inappropriate, which Dr. Pell believed would continue without treatment. Moreover, at the time of the section 303 hearing, N.S.'s need for self-protection was established by evidence of N.S.'s continued inability to recognize or understand the nature of his mental illness, lack of cooperation in obtaining past mental health history records, refusal to believe he needed treatment or medication, reluctance to take his medication, and declaration that he would not continue taking medication if discharged. As in *In re T.T.*, Dr. Pell's testimony made it clear that N.S.'s condition would continue to escalate over the next 30 days if he were not committed and treated. 875 A.2d at 1128. Thus, we conclude that the trial court did not err in certifying N.S.'s continued involuntary treatment under section 303. Accordingly, we affirm.[6]

Order affirmed.

Judge Strassburger did not participate in the consideration or decision of this case.

---

[6] To the extent the trial court relied on 50 P.S. § 7304(a)(2) ("section 304") to establish "that the conduct originally required by section 301(b) in fact occurred," this was error. *See* Trial Court Opinion, 5/20/20, at 4–5 & n.5. Section 304 of the MHPA was not at issue here, and section 303 does not contain an analogous subsection.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 07/14/2021